DANIEL L. SHEEHAN, Attorney. (CA SBN 176073)
3705 Haven Avenue, Suite 108
Menlo Park, CA 94025
Telephone: (877) 878-1700
Facsimile: (650) 649-1802
Email: dan@svwl.org

Attorney For Defendant
HISAKO MATSUBARA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>HISAKO MATSUBARA<br><br>Defendant | Case No. 25-3770<br><br>**ANSWER TO COMPLAINT**<br>**TO REDUCE CIVIL PENALTY**<br>**ASSESSMENTS TO JUDGEMENT** |

### VERIFIED ANSWER TO COMPLAINT AND AFFIRMATIVE DEFENSES

Defendant, HISAKO MATSUBARA, by and through her attorney, DANIEL L. SHEEHAN, respectfully submits this Verified Answer to the Complaint filed by the UNITED STATES OF AMERICA. Defendant answers the Complaint paragraph by paragraph and asserts Affirmative Defenses as follows:

### RESPONSES TO ALLEGATIONS

### INTRODUCTION

1.     Defendant admits that this is a timely civil action to collect purported outstanding unpaid civil penalty assessments, made pursuant to 31 U.S.C. § 5321(a)(5), commenced by the United States against the Defendant. Although these penalties, commonly known as "FBAR penalties," are assessed against the Defendant, the Defendant denies that the penalties arise from her willful failure to timely report on Treasury Form TD 90-22.1, Report of Foreign Bank and Financial

1    Accounts (FBAR), her financial interest in accounts at Sarasin & Cie AG during the 2005, 2006,

2    2007, 2008, and 2009 calendar years, as required under 31 U.S.C. § 5314 and its implementing

3    regulations.

4    2.    Defendant admits that the United States is entitled to bring this action with the authorization

5    of the Secretary of the Treasury (31 U.S.C. § 3711(g)(4)(C)) at the direction of the Attorney

6    General of the United States.

7                                            **DEFENDANT**

8    3.    Defendant admits she is a resident of Los Altos, California, and a U.S. citizen.  Defendant

9    was born on May 21, 1935, in Kyoto, Japan.  Defendant comes from an old Japanese family,

10   documented in Kyoto Imperial Court documents, since the 1200's.    Defendant's father, Shizuka,

11   was one of the most respected scholars of ancient Chinese philosophy.  Shizuka was a Japanese

12   Shinto priest who had his run in with the Japanese military government.  As a young priest,

13   Shizuka was very vocal opposing the Japanese war in China and entry into World War II.  Because

14   of his stature and social standing, the Japanese government was reluctant to imprison him, but they

15   did place him under a gag order.  Shizuka was the Japanese Shinto emissary who met with Pope

16   John XXIII before the Second Vatican Council.  Defendant herself is an ordained Shinto priestess,

17   though she has never practiced.  To Defendant, it is against her fundamental principle to cheat

18   anyone, even the government, as evidenced in the notion of Makoto.  Makoto means 'sincerity'

19   and is the overall basis of Japanese religious feelings.  It is not rules or codes, but simply

20   emphasization of the heart and sincerity within a good heart.  Makoto is important to the core

21   beliefs of Shintoism.  It is the understanding that even with all the rules, regulations,

22   commandments and orders consuming other religions, if goodness and sincerity is not in your

23   heart, all of those acts are pointless.  Shinto is interested not in credenda but in agenda, not in

24   things that should be believed but in things that should be done.  By cheating the government,

25   Defendant would not only be cheating her country, but her own existence and morality.  Defendant

26   further admits that she has been married to Dr. Friedemann T. Freund ("Friedemann") since before

27   the years at issue.  They met in 1960 at Pennsylvania State University while Friedemann was a

28   Post-Doc and Defendant was working on her master's degree.  Friedemann and Defendant were

married in Kyoto, Japan, on January 21, 1961, with Defendant's father, Shizuka, presiding over the Shinto ceremony. They had a second (civil and church) marriage on February 4, 1961, in University Park, Pennsylvania, at the Pennsylvania State University Chapel. Defendant and Friedemann had one child, a son, Minoru M. Freund ("Mino"), born February 1, 1962. Mino was born in the United States. After Mino's birth, in the summer of 1962, the family moved to Germany, where Friedemann was on a path to become a full-time professor for the next 23 years.

4.      Defendant admits that she is an award-winning Japanese novelist who has published works in Japanese, which is her native language, German, and English. Defendant is fluent in Japanese, German, and English.

5.      Defendant admits that she earned an MA from Pennsylvania State University and her Ph.D. in Germany. Defendant earned her BA (in History) from International Christian University in Tokyo, Japan. On August 2, 1958, Defendant came to the United States for the first time. She was a student at Pennsylvania State University, where she received her master's degree in 1960 in History of Theatre. In 1962, Defendant went to Germany with Friedemann where he became a professor. While in Germany, Defendant studied History of Thought, a division of Philosophy. She received her Ph.D. in 1970 in History of Religion. Defendant was also an Honorary Visiting Scholar for three years at the Hoover Institute at Stanford University, known for its voluminous library of Japanese language documents, many in handwriting. Defendant has never taken a class in tax, accounting, finance, or business.

6.      Defendant admits that she has lived permanently in the United States since 1995 and was a U.S. person during the time period relevant to the civil penalties at issue in this action within the meaning of 31 C.F.R. § 1010.350(b). Defendant became a United States citizen in 2007.

## JURISDICTION, VENUE

7.      Defendant admits that this Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 1355.

8.      Defendant admits that venue properly lies in the Northern District of California under 28 U.S.C. §§ 1391(b)(1) and 1395(a) because the Defendant resides within this judicial district and because the purported omissions that gave rise to the penalty and the penalty assessment were

1  made while she resided in this judicial district.

2  **DIVISIONAL ASSIGNMENT**

3  9.    Defendant admits that this case should be assigned to the San Jose Division because the

4  Defendant resides in Santa Clara County.

5  **FBAR REPORTING REQUIREMENTS**

6  10.    Defendant admits federal law requires every U.S. citizen and resident who has a financial

7  interest in or signatory authority over a bank, securities, or other financial account in a foreign

8  country to report that relationship to the Internal Revenue Service for each year the relationship

9  exists, as per 31 U.S.C. § 5314(a) and 31 C.F.R. § 1010.350(a).

10  11.    Defendant admits that to fulfill this requirement, each such United States resident or citizen,

11  i.e., U.S. person within the meaning of 31 C.F.R. § 1010.350(b), must file with the IRS a "Report

12  of Foreign Bank and Financial Accounts", commonly known as an "FBAR." Defendant admits that

13  the proper form to report FBAR information was Treasury Form  TD 90-22.1, for calendar years

14  2005 through 2012.

15  12.    Defendant admits that for each of the years at issue in this action,  an FBAR was required to

16  be filed by June 30 of the subsequent calendar year for any year in which the aggregate balance of

17  the foreign financial accounts exceeded $10,000.00.

18  13.    Defendant admits that any U.S. person, within the meaning of 31 C.F.R. § 1010.350(b), who

19  is required to comply with the FBAR reporting requirements, but fails to do so, may be subject to a

20  civil penalty.  Defendant further admits that for violations involving the willful failure to report an

21  interest in a foreign account,  the maximum civil penalty for each violation is the greater of

22  $100,000.00 (adjusted for inflation) or 50% of the balance in the account at the time of the

23  violation as delineated in 31 U.S.C. § 5321(a)(5)(C).   To the extent that paragraph 13 implies that

24  Defendant violated these laws, such implication is denied.  English being their third language, it is

25  difficult form both Defendant and  Friedemann to understand English formulation.

26  14.    Defendant admits that this FBAR penalty is subject to interest and additional penalties or

27  other additions under U.S.C. § 3717.

28  /////

## DR. MATSUBARA'S FOREIGN ACCOUNTS AT SARASIN & CIE AG

15.    Defendant admits that during calendar years 2005 through 2009, she had a financial interest in, or signatory authority over, two bank accounts with Sarasin & Cie AG ("Sarasin Bank") in Switzerland.

16.    Defendant admits that the Sarasin Bank account numbers ended in *048.6 and *065.9 (the "Sarasin Accounts").

17.    Defendant admits that for each of the calendar years at issue, the aggregate balance of the Sarasin Accounts exceeded $10,000.00 in U.S. currency.

18.    Defendant admits that she was required by law to file FBARs reporting her financial interests in the Sarasin Accounts.

19.    Defendant admits that she did not file FBAR forms disclosing the Sarasin Accounts for calendar years 2005 through 2009 by June 30 of the subsequent year for each calendar year. However, Defendant did voluntarily file FBAR forms disclosing the Sarasin Accounts for the calendar years 2005 through 2009 when she discovered she was required to file FBAR forms for 2005 through 2009 for the Sarasin Accounts.

20.    Defendant admits that the Sarasin Accounts were closed in 2009, and all funds were transferred to Commerzbank in Germany, which income has always been reported on U.S. tax returns.

## DR. MATSUBARA'S FAILURE TO REPORT THE
## FOREIGN ACCOUNTS WAS WILLFUL

21.    Defendant denies that she willfully failed to file FBARs for calendar years 2005 through 2009.

22.    Defendant admits that during the years 2005 through 2009, Defendant was the sole owner of the Sarasin Accounts.

23.    Defendant admits that during the years at issue, her husband, Friedemann, was an authorized user of the Sarasin Accounts.

24.    Defendant admits that Friedman is a solid state physicist who served as a senior scientist at NASA for over 30 years.  Friedemann was born on July 18, 1933, in Wetzlar, Germany, a small

town not far from Frankfurt.  Wetzlar was known as the center of the optical and precision tool industry in Germany.  Friedemann's father, Walter Freund ("Walter"), and Walter's younger brother, Hugo Freund ("Hugo"), were executives at the Leitz Company, famous for its Leica cameras and high-precision products. The last name Freund is relatively common among Jewish families.  Although not Jewish, the family was always in danger.  Walter was never a member of the Nazi party and an outspoken critic of Hitler.  One day, Friedemann's father was picked up by the Gestapo and sent to the Buchenwald Concentration Camp.  Fortunately, a family friend, Dr. Walter Heimann ("Heimann"), one of the top scientists in Berlin and indispensable for Hitler's war machine, intervened on his behalf by placing a phone call to Himmler, the most feared head of the Gestapo.  In fact, after World War II, Heimann was so valuable as a scientist that the United States brought him to Alabama to build the first camera that sent the first video images from space, recorded by U.S. satellites.  It was only from this friendship that Walter was released after two months in Buchenwald - alive but not in good health.

Friedemann was twelve years old when World War II ended.  From all he witnessed and experienced during World War II, he was elated when his father sent him abroad from war-ravaged Germany as soon as possible after the end of the war.  Friedemann went to study in Geneva, in French-speaking Switzerland, the same city where his father was a trainee in the 1920s.  It was during this time in Switzerland that Friedemann opened a small personal bank account at Bank Sarasin, which he and Defendant later kept for years.

Friedemann graduated in 1954, earning a bachelor's degree in General Science and Humanities.  He then continued his studies in Germany, earning another bachelor's degree in 1955 in Physics.  He furthered his education in Germany, earning a master's degree in 1957 in Inorganic Chemistry.  He then earned a Ph.D. in Germany in 1959 in Mineralogy/Crystallography. Friedemann has never taken a class at any level in tax, business, accounting, or finance.  In December 1959, Friedemann accepted a postdoctoral position at Pennsylvania State University. This position continued until the summer of 1962.  It was a paying position, and Friedemann filed income tax returns in the United States on the salary he was paid in 1960, 1961, and 1962.  These were simple tax returns and not complicated, so Friedemann personally prepared and filed the

1  returns.

2      From 1962 to 1989, Friedemann became a tenured professor in Germany, first at the

3  University of Göttingen and later at the University of Cologne.  Friedemann deposited all of his

4  earnings into his Commerzbank account, which was the successor of an account that his father had

5  opened with Commerzbank in or around 1923.  The account survived Nazi-Germany and World

6  War II.  Friedemann opened a subaccount in 1959, the year he obtained his Ph.D. from the

7  University in Marburg, Germany.

8      Friedemann's work has been focused in the research and academic fields.  Initially, he was

9  an assistant professor at the University of Göttingen from 1962 to 1968 and then a full tenured

10  professor at the University of Cologne from 1968 to 1987, although for the last two years he was in

11  the United States but still on the University of Cologne faculty.  During these 27 years,

12  Friedemann conducted research on earthquake and pre-earthquake physics at academic institutions

13  all over the world as exemplified in his TEDx presentation.

14      Although Friedemann was still a tenured professor in Germany, Friedemann and Defendant

15  returned to the United States in 1985.  Friedemann was a Senior National Research Council Fellow

16  at the NASA Ames Center.  Friedemann received a Green Card in 1985 when he accepted his job

17  at NASA Ames Center.  In 1989, Friedemann became an Adjunct Professor of Physics at San Jose

18  State University teaching Solid State Physics.  That year, he also became a senior scientist at

19  NASA Ames Center.

20      Friedemann is fluent in German, French and English.  However, English is his third

21  language.  Friedemann became a U.S. resident in 1985 and a U.S. citizen on December 7, 2001.

22  25.    Defendant admits that during the years at issue, she and Friedemann filed joint federal

23  income tax returns using the filing status "married filing jointly."

24  26.    Defendant admits that during the years at issue, Defendant and Friedemann had their federal

25  income tax returns prepared by Kerry C. Bradford, C.P.A. ("Bradford").

26  27.    Defendant admits that Bradford began preparing Defendant's and Friedemann's taxes in

27  2004, after Bradford acquired the practice of the previous tax preparer, Philip Krozek, C.P.A.

28  ("Krozek").

When Friedemann was a fellow at Pennsylvania State University from 1960 to June 1962, Friedemann earned a salary and filed "short form" U.S. tax returns for 1960, 1961, and 1962. When he sojourned to Germany, where he taught through 1985, Friedemann and Defendant did not file tax returns in the United States. From 1985 through 1993, when their returns were simple, Friedemann and Defendant prepared and filed their own returns. Friedemann does recall that he prepared those returns consistent with what he was told by the German authorities that the income generated in the Commerzbank accounts had to be included on their U.S. tax returns. Accordingly, Friedemann and Defendant always reported their income from the German Commerzbank accounts.

Since 1993, when their returns became more complicated due to business ventures, Friedemann and Defendant have always relied on professionals for the preparation of their quarterly estimates, for the preparation and filing of their personal and business income tax returns, and for all forms required to be filed disclosing foreign bank accounts and assets.

For their 1993 return, while Friedemann and Defendant were just U.S. residents and not citizens, they determined that they needed someone to prepare a tax return for a small company Friedemann had started. He was referred to and retained the tax preparation services of Krozek for the company and for their personal returns. Friedemann and Defendant mentioned to Krozek that they had a Swiss account, but it only had 100-500 Swiss francs, earned relatively no interest, and had no activity for many years. Friedemann also mentioned that Switzerland taxed any income earned at a 35% rate, and the Swiss taxes were withheld from the earnings and no tax return was required to be filed in Switzerland since they just accepted the automatic Swiss tax withholding. Since there was no requirement to disclose the account because it had such a small amount, and there was virtually no income, Krozek said he would disregard the Swiss account. In all subsequent yearly meetings with Krozek, the question of foreign bank accounts never came up again.

Friedemann and Defendant did disclose to Krozek that they had a German account and that it had in excess of $10,000.00 and had income. Friedemann showed Krozek his prior returns and that he had reported the income from Germany each year. Friedemann understood that there was

1    no requirement to file income tax returns in Germany for the income on his Commerzbank account

2    because he was no longer a resident of Germany.  However, he was required to report the income

3    from Commerzbank in the country where he was a resident, the United States.  Since Friedemann

4    and Defendant were residents of the United States, they showed and told Krozek that they were

5    required to report the income from Commerzbank on their U.S. tax returns.

6        Krozek prepared their returns, reported the Commerzbank income from Germany, and

7    disclosed on Form B, Interest and Dividends, that there was an account in Germany.  Krozek

8    prepared the annual Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts, for

9    them.  Krozek never discussed the requirement of filing an FBAR report, although he prepared the

10   Form TD F 90-22.1, which was the equivalent of the FBAR.  The Defendant and Friedemann were

11   unfamiliar with the term FBAR.

12       Friedemann recalls that at that first meeting with Krozek, Defendant and he informed

13   Krozek that Defendant would be inheriting money from her father's estate in Japan, and they were

14   planning on depositing the money into their Swiss account.  They also told Krozek that they were

15   planning on retiring in Switzerland, hopefully soon.  However, the inheritance would not be

16   received until the death of Defendant's mother.  They asked Krozek if they had to report any of

17   Defendant's inheritance on their U.S. tax forms.  Krozek told them "No."  Krozek further told them

18   that since the source of the funds came from an inheritance, which had been duly taxed in Japan,

19   and passive income was being automatically taxed at 35% in Switzerland and withheld from the

20   earnings, there was "no need to include the income in their tax filings."  From this, Friedemann and

21   Defendant concluded that since there was no need to report the income from the inheritance if it

22   were placed in a Swiss account, then there was no need to disclose this Swiss Account.

23   Defendant's mother passed away on April 24, 1995, which was after their annual meeting with

24   Krozek for the preparation of their 1994 tax returns.  The following year in 1996, when they met

25   with Krozek for the preparation of their 1995 tax returns, they inadvertently failed to bring up the

26   inheritance since it was one year later.  Defendant had already deposited her inheritance into the

27   Sarasin account and was automatically charged taxes and withheld at 35% on the income generated

28   in the Sarasin account.  Neither Friedemann nor Defendant sought other advice about the taxability

Verified Answer to Complaint and Affirmative Defenses

1   or reporting obligation of Defendant's inheritance since they trusted Krozek, had confidence in his

2   tax knowledge, and were assured that the inheritance was not a taxable event in the United States.

3          Thereafter, in each year through 2003, Friedemann and Defendant would visit Krozek's

4   office once a year at tax time and would deliver a box with individual folders holding source

5   documents, income statements, and a summary sheet.  They sat down with Krozek and discussed

6   the information and source documents in the folders.  They didn't use the tax organizer sent out

7   each year to help them prepare for the preparation of their taxes.  Friedemann and Defendant were

8   comfortable with their habit of putting source documents and income statements together, putting

9   them in folders and in a box, and bringing the box and the summary sheet to the meeting.  Krozek

10  would then take the documents and prepare the returns.  After preparation, Krozek would send the

11  tax returns and box to Friedemann and Defendant with signing and filing instructions.

12  28.    Defendant admits that Bradford received all client files from Krozek, including prior tax

13  documentation for Defendant and Friedemann

14  29.    Defendant admits that Bradford, upon beginning representation of Defendant and

15  Friedemann, reviewed Defendant's and Friemann's files and observed that they had consistently

16  disclosed a German Commerzbank account on prior returns.  Defendant admits that she and

17  Friemann consistently disclosed a German Commerzbank account on their prior returns.  In 2004,

18  Krozek retired and sold his C.P.A. practice to Bradford.  Bradford informed Friedemann and

19  Defendant that he had purchased Krozek's practice, introduced himself via a letter, and said he

20  would be willing to continue preparing their tax returns.  Bradford also told them that he had their

21  prior tax filings, which Krozek had given to him.  After Bradford purchased Krozek's practice,

22  Bradford did not have a new client interview with Friedemann and Defendant for the preparation

23  of their initial 2004 return.  When Friedemann and Defendant met with Bradford for the first time,

24  there was no discussion brought up by Bradford about any foreign accounts, although their prior

25  returns prepared by Krozek indicated there was a foreign account in Germany.  Bradford did not

26  question them about the German account or any other foreign accounts.  They liked Bradford and

27  agreed to retain his firm for the preparation of their income tax returns and foreign filings.

28  30.    Defendant admits that for the tax years 2004 and onward, Defendant and Friedemann jointly

1  collected the records in the file folders that were subsequently given to Krozek and then Bradford.

2  They continued to provide Bradford with documentation for the Commerzbank account, including

3  account statements.  As with Krozek, Friedemann and Defendant had only a once-a-year contact

4  with Bradford when they went to his office bringing their folders and box with source documents,

5  income statements, and a summary sheet.  They would meet with Bradford for approximately one

6  hour and go over the source documents and income statements.  During the following years,

7  Bradford just prepared the returns based on the same information in their template from the prior

8  year.  Friedemann and Defendant reviewed the returns and signed the E-File form and mailed it

9  back to Bradford, being totally absorbed in their own academic and belletristic activities.

10  Friedemann and Defendant had no clue about income tax law and had no reason to question

11  Bradford's preparation.  When they switched CPAs to Bradford when Krozek sold his CPA

12  practice to him, they did not have a discussion with Bradford about the Swiss account, and

13  Bradford just prepared the return based on the same information in their template from the prior

14  year.

15  31.    The United States implies that the Defendant solely met with Bradford during the years at

16  issue.  Defendant denies that she solely met with Bradford each year.  Defendant and Friedemann

17  both met with Bradford each year for the tax preparation meeting.  The United States also claims

18  that the Defendant filled out tax questionnaires for each year.  Defendant denies that she filled out

19  tax questionnaires each year for tax preparation.  Defendant also denies that Friedemann filled out

20  the tax questionnaire, and she did not review that tax questionnaire for each tax year in preparation

21  for the meeting with Bradford because the tax organizer was so overwhelmingly complex to them.

22  Defendant denies that she provided the documentation for the preparation of her federal tax

23  returns.  Defendant admits that Defendant and Friedemann assembled and provided the

24  documentation for the preparation of their joint income tax returns.

25  32.    Defendant denies that Bradford advised her each year that she was responsible for providing

26  complete and accurate information regarding her financial accounts.

27  33.    Defendant admits that income from the Commerzbank account was accurately reported on

28  joint federal tax returns (Form 1040) during the years at issue.

34.     Defendant admits and denies that for each of the years at issue, the Defendant and Friedemann disclosed the Commerzbank account on Schedule B, Part III of Form 1040, checking the box indicating a foreign account and identifying "Germany" as the country.  Defendant admits that the Commerzbank account in Germany belonged to Friedmann, which account was established many years before the Defendant met Friedemann.  Defendant admits that the disclosure was made on Schedule B, but both the Defendant and Friedemann made it, although the Commerzbank account was in the name of Friedemann and was from his assets before their marriage, and which had his monthly retirement deposits from Germany.

Friedemann's father opened an account with Commerzbank around 1923.  The account survived Nazi-Germany and World War II.  Friedemann inherited the Commerzbank account from his father in the 1950s.  Friedemann opened a subaccount in 1959, the year he obtained his Ph.D. from the University in Marburg, Germany.  From 1962 to 1985, Friedemann, while a professor in Germany, deposited all of his earnings into his Commerzbank account in Germany.  Since 1987, the only deposits made into the Commerzbank account were Friedemann's German social security benefits.  These were automatic monthly deposits.

In 1982, both the Defendant and Friedemann were in the United States for six months total on visitor visas, with Friedemann taking sabbatical leave from his university position in Germany.  Neither Defendant nor Friedemann was required to report taxes in the United States.  After Friedemann left the United States in June 1982 and was no longer a resident of the United States or had an obligation to report earnings in Germany, he deposited his German earnings from being a professor into his Commerzbank account.  All of this income was earned outside the United States and reported to the German tax agency with proper tax filings.  While living in Germany, Friedemann added Defendant to his account.  No other person was added to the account.  Neither Friedemann nor Defendant talked to anyone at the bank when it was opened or when Defendant was added.  They clearly never asked questions about obligations to notify anyone in the United States or file tax documents in the United States because they were German and Japanese citizens, respectively, and, at that time, had no connection to the United States and no intention of returning to the United States.

35.     Defendant denies that Bradford prepared FBARs for the Commerzbank account and sent them to Defendant along with filing instructions.  Defendant admits that Bradford prepared FBARs for the Commerzbank account and mailed them to Friedemann along with filing instructions for Friedemann to sign.

36.     Defendant denies that during the years at issue she knew of the FBAR requirements.  On Thursday, March 27, 2014, while Friedemann was driving to work, he heard on KQED radio that there was a requirement for disclosure of foreign accounts and there were severe penalties for failure to do so.      Friedemann wrote:

> "Dear Kerry,
>
> I know you are VERY busy these days but we have a dual question, maybe a quick one.
>
> Since long before Hisako and I moved to the USA in 1987, Hisako had an account with a Swiss bank.  After her father died, she deposited her part of the heritage into this account.  She never took any money out of this account – it was just sitting there, growing in value.  We never declared it on our US tax returns.
>
> Question:
>
> Does the increase in value of a foreign bank account, from which no money was ever withdrawn, create any tax liability according to US tax law?
>
> In 2009 the Swiss bank asked Hisako to close this account because it no longer wanted to have any customers from the USA.  Hisako transferred all monies to our account with the German CommerzbankBank, which we have always declared on our US tax returns.
>
> Question:
>
> Would transfer of money from a private Swiss account to a private German bank account have created any tax liability according to US tax law?
>
> Thanks
>
> Friedemann"

Verified Answer to Complaint and Affirmative Defenses

Bradford responded that same evening:

> "Hi Friedemann,
>
> This actual is a very big issue and the IRS has been levying large penalties for non-reporting.  I had a client in a similar situation and ended up paying almost 50% of the value of the account in back taxes and penalties.
>
> You need to speak with an attorney as soon as possible who understands the rules and the latest options you have for dealing with this.  I have not dealt with any of these attorneys directly myself, I just found doing a Google search on FBAR attorneys (Foreign Bank Account Reporting).
>
> (Three attorney website links).
>
> Thanks,
>
> Kerry"

Therefore, Forms TD F 90-22.1 were filed for 2005, 2006, 2007, 2008, and 2009.

In the Agent's report, he claims that Defendant and Friedemann first learned of the FBAR requirement for all foreign accounts in 2012.  All facts prove that the Defendant and Friedemann learned of the FBAR on March 27, 2014.  There is email traffic between Friedemann and Bradford on March 27, 2014.  There is the "Statement of Kerry Bradford, C.P.A. for Friedemann Freund and Hisako Matsubara" which states that in 2014 Friedemann informed Bradford of the existence of a separate foreign account (Sarasin).  Defendant and Friedemann provided proof of payment to their first tax attorney (Meynard) with whom they met in May 2014 to discuss the FBAR issue.  These are all consistent with their statement that they discovered about the FBAR requirements in March 2014 and not 2012.  The timing is critical because the United States is making a determination that Defendant did not act for two years after learning about her obligation to correct their filed FBAR reports, including the Sarasin Accounts.  In fact, Defendant and Friedemann acted within days of taking steps to correct the FBAR reports that had been filed.

37.    Defendant denies that during the years at issue she knew of the FBAR requirements because her husband reported his foreign account.  The United States assumes, without proof, that Defendant had knowledge of the requirement to file FBARs.

Verified Answer to Complaint and Affirmative Defenses

38.    Defendant admits that during the years at issue,  Friedemann filed FBARs disclosing a foreign account that he owned at Commerzbank in Germany.

39    Defendant admits that FBARs were properly filed for the Commerzbank account under Friedemann's name during the years at issue.

40.    Defendant denies that information was not disclosed to Krozek and Bradford that the Sarasin Accounts existed prior to the years at issue and during the years at issue.

41.    Defendant admits that, as a result of her nondisclosure, income from the Sarasin Accounts was not originally reported on the joint federal tax returns for the years at issue.  Defendant informed Krozek of the Sarasin Accounts and Krozek advised Defendant and  Friedemann that because the income tax rate in Switzerland on the withholding of tax on the income from the Sarasin Accounts was higher (35%) than the U.S. income tax rates, and there was less than 5000 Swiss francs, that there was no need to report the income on the federal return since there was no tax benefit.

42.    Defendant denies that the first time she disclosed the Sarasin Accounts to Bradford was in 2014, after the deadline for the filing requirements for the years at issue had passed.  Defendant never informed Bradford of the Sarasin Accounts.  As documented in the letter from Scott Meynard, Bradford was informed of the Sarasin Accounts by Friedemann on March 27, 2014, when Friedemann first learned of the possible obligation of Defendant and Friedemann to report the Sarasin Accounts on Form  TD 90-22.1 by listening to a KQED Radio program.  Bradford then researched the issue and found tax lawyer Scott Meynard in Santa Clara County.

43.    Defendant denies that she failed to identify Switzerland as a country where she had a foreign account on her tax returns despite knowing she held the Sarasin Accounts during the years at issue. Defendant and Friedemann informed Krozek of the Sarasin Accounts and Krozek did not identify Switzerland as a country where she had a foreign account because there was only a small amount of Swiss francs in this account.  During the years at issue, Bradford just used the template of the years before of tax returns prepared by Krozek and since all prior returns had been filed in that same manner by Krozek, neither Defendant nor Friedemann had any reason to question the failure of Bradford to identify Switzerland as a country where Defendant had a foreign account.  Bradford

1   used the template he received from Krozek for the 2004 tax preparation and continued to use that

2   same template for each tax return for 2005 through 2009.

3   44.    Defendant admits that she never inquired whether the Sarasin Accounts triggered any U.S.

4   reporting or FBAR filing requirements.

5   45.    Defendant denies that she took active steps to conceal the existence of the Sarasin Accounts

6   from the United States government.

7   46.    Defendant denies that she selected Sarasin Bank because she believed the bank would keep

8   her identity confidential and not report her account to the U.S. government.

9   47.    Defendant admits that she wrote a letter dated May 2014 to an employee of Sarasin Bank

10   referencing reading a New York Times article about Credit Suisse inquiring whether Sarasin Bank

11   would keep her identity confidential and not report her account to the U.S. government.

12   48.    Defendant admits that in that same letter to Sarasin Bank in May 2014, Defendant wrote that

13   she selected Sarasin Bank expecting that it would not disclose her name "to anybody, in particular

14   not to any U.S. Government authority."

15   49.    Defendant admits that correspondence dated March 23, 2014, Defendant wrote to Sarasin

16   Bank: "We never disclosed our relationship with Sarasin Bank to the German or U.S. tax

17   authorities.  The reason for not wanting to disclose was simply because the Defendant and

18   Friedemann both firmly believed that there was no need to report the Sarasin account to the US tax

19   authorities because they were paying tax in Switzerland to the tune of 35%.  It is also worth noting

20   that 2008 was a very tumultuous year for US financial markets, full of news about dubious

21   financial schemes and scandals.

22   50.    Defendant denies that she refused to complete IRS Form W-9 upon request by Sarasin Bank.

23   51.    Defendant admits that she and Dr. Freund instructed Sarasin Bank to sell all U.S. securities

24   in her account because of the U.S. financial markets were full of turmoil, replete with daily news

25   about dubious schemes and scandals.

26   52.    Defendant denies that she demanded that Sarasin Bank not report her account to the U.S.

27   government.

28   53.    Defendant denies that she and Friedemann instructed Sarasin Bank to hold all account

1  statements.  Defendant denies that she instructed Sarasin Bank to hold all correspondence and

2  communications since at least 2004 and through the years at issue.  Defendant requested that

3  Sarasin Bank issue an annual statement to her.  Defendant and Friedemann requested annual

4  statements solely because neither of them have a mindset to follow financial issues, ups and downs

5  of the stock market, securities, annuities, etc.  This is not who Friedemann and Defendant are.

6  That is why they asked Bank Sarasin to send financial statements once a year.

7  54.    Defendant admits that she instructed Sarasin Bank to transfer the full balance in the Sarasin

8  Accounts to the German Commerzbank account.  However, the United States implies that it was

9  only after being informed that her account would be closed that Defendant transferred the full

10  balance.

11  **COUNT ONE:**

12  **REDUCE WILLFUL FBAR PENALTIES TO JUDGMENT**

13  ***Liabilities for Civil Penalties***

14  55.    Defendant admits that the United States incorporates by reference the allegations in

15  paragraphs 1 through 55.

16  56.    Defendant admits that during the calendar years 2005 through 2009, Defendant was a United

17  States person within the meaning of C.F.R. § 1010.350(b).

18  57.    Defendant admits that during the calendar years 2005 through 2009, Defendant had a

19  financial interest in, or signature or other authority over, the Sarasin Accounts within the meaning

20  of 31 C.F.R. §  1010.350(e) or (f).

21  58.    Defendant admits that the Sarasin Accounts were bank accounts in a foreign country,

22  Switzerland.

23  59.    Defendant admits that during the calendar years 2005 through 2009, the aggregate balance

24  in the Sarasin Accounts exceeded $10,000.00.

25  60.    Defendant admits that she did not file by June 30 of the following year FBARs for the

26  calendar years 2005 through 2009 to report her financial interest in the Sarasin Accounts.

27  Defendant believes that, based on Reasonable Cause, the FBAR reports were timely filed as

28  prescribed by 31 U.S.C. § 5314 and 31 C.F.R. §  1010.306(c).

61.     Defendant denies that she failed to file timely FBARs for calendar years 2005 through 2009 and that failure to file FBARs for calendar years 2005 through 2009 by June 30 of the following years was willful within the meaning of 31 C.F.R. § 5321(a)(5).  They were not informed and knowledgeable enough to notice the difference.  They followed the protocol established with Krozek, delivering the same source documents and income statements in their box, which included the report from the German bank Commerzbank.  Each year, the box on Schedule B was checked with the reference that they had a foreign account in Germany.  In addition, the income from Commerzbank was reported on every return.  It appears that Krozek never included in his notes or files that Defendant had an inheritance, and they were planning on depositing the inheritance into a Sarasin Account.

Except for their initial meeting with Krozek in early 1994, when they were still German and Japanese citizens and were filing returns in the United States solely as residents, they never sought legal or tax advice about how to report foreign source income or filing requirements for foreign accounts.  In their minds, they were paying taxes in the United States on their German income, because it was not subject to taxes in Germany.  So that made sense.  However, they were paying tax in Switzerland at a higher rate on their Swiss income, 35%, so it made sense to them that there was no need to report the income in the United States, and to the best of their recollection, Krozek had confirmed that.  They had no knowledge about the foreign tax credit or the alternative minimum tax, so they thought they were paying the full tax.  Given their reasonable belief that you only have to pay tax once, they thought they were filing complete tax returns.  And, Bradford annually filed their FBARs for every year but 2009.

Bradford recalled that in 2014, Friedemann did question Bradford why he had to pay income taxes on Swiss income if they did not withdraw funds from that account.  Bradford responded that they had to pay taxes on the income, even though they did not withdraw any money from that account.  To Friedemann and Defendant this did not cause them to question the Sarasin account because they were paying taxes in Switzerland on the income that they earned at Sarasin.  As to the Commerzbank income, they were NOT paying taxes in Germany but in the United States.  They had worked under the belief that taxes only had to be paid once on income.  The conversation did

1   not expand to general reporting requirements with regards to foreign accounts.

2       Bradford stated to the Agent that in his opinion, "the Defendant and Friedemann had below

3   average tax knowledge."  Also, he thought "the Defendant and Friedemann failed to disclose their

4   account based upon a misunderstanding or ignorance."

5       Each year Bradford, whom Friedemann and Defendant respected and trusted, and thought

6   had filed all required forms, prepared Form TD F 90-22.1, Report of Foreign Bank and Financial

7   Accounts, for them.  When the returns were prepared, Bradford sent a cover notice informing

8   Friedemann about the filing of the TD F 90.22-1.

9       Friedemann and Defendant have a history of timely filings for their personal and business

10  tax returns.  All returns prepared by Krozek and Bradford were electronically filed by Krozek and

11  Bradford.  Since 1993, Friedemann and Defendant have relied one hundred percent (100%) on the

12  services of professionals for all tax-related services.  In 2004, Friedemann and Defendant changed

13  income tax preparers to Bradford.  As was their practice before retaining the services of Bradford,

14  they would meet with Bradford in his office once a year and present him with a box full of receipts

15  and a sheet for each year, which would summarize the numbers in the files in the box.  They

16  delivered their income tax information to Bradford with plenty of time to prepare the returns by the

17  due date.  Friedemann and Defendant did not change their approach in furnishing their income tax

18  data from Krozek to Bradford.  They did not fill out the Tax Organizers mailed to them each year.

19  This was confirmed by the Agent in his Agent Initial Interview.  They personally gathered all

20  receipts, supporting documents showing their income and deductions, and their handwritten notes

21  and placed them in folders in a box and brought the box to Krozek and Bradford for review by

22  them in preparation of their income tax returns.  Bradford also confirmed to the Agent that every

23  year, he would mail to his clients with the Tax Organizer a copy of the prior year's FBAR with a

24  statement asking for a new highest value amount and to include any **NEW FOREIGN**

25  **ACCOUNTS**.  Friedemann and Defendant never opened **NEW FOREIGN ACCOUNTS** so there

26  was no need to include the Sarasin Accounts.  The Sarasin Accounts had been open for 20 years.

27      On the Schedule B for the taxable years in question, there are conflicting statements on

28  Schedule B.

1    For the tax returns on Schedule B for the years 2005 and 2006, it states under Part III Foreign

2    Accounts and Trusts, line 7a:

3          "At any time during (2005 and 2006), did you have an interest in or a

4          signature or other authority over a financial account in a foreign country,

5          such as a bank account, securities account, or other financial account?"  Line

6          7b then asks:  "If 'Yes,' enter the name of the foreign country."

7          For the tax returns on Schedule B for the years 2007, 2008, and 2009, it states under Part III

8    Foreign Accounts and Trusts, line 7a:

9          "At any time during (2007, 2008, and 2009), did you have an interest

10         in or a signature or other authority over a financial account in a foreign

11         country, such as a bank account, securities account, or other financial

12         account?  See page B-2 for exceptions and filing requirements for Form TD

13         F 90-22.1."  Line 7b then asks:  "If 'Yes,' enter the name of the foreign

14         country."

15         There is no specific mention of an FBAR.  Since the Defendant and Friedemann used a

16    professional CPA to prepare their returns, they looked to the CPA to be familiar with the filing

17    requirements for Form TD F 90-22.1.  For the tax returns for 2007 and 2008, Bradford prepared the

18    Form TD F 90-22.1.  For the Form TD F 90-22.1 for 2009, because of a time issue, Friedemann

19    personally filled out the form and mailed it to the Treasury Department.

20         On June 21, 2010, Bradford sent an email to Friedemann regarding the subject: "Foreign

21    Account Filing Due June 30."  The email instructed Friedemann to file the Form F 90-22.1.  It

22    included the first page and was generated from Bradford's tax preparation software with the

23    information from the 2008 Form TD F 90-22.1 auto-filled into the 2009 template.  Since nothing

24    had changed on this first page, Friedemann did not edit the Form TD F 90-22.1 first page.

25    However, since Friedemann and Defendant had transferred their funds from Sarasin to Commerz,

26    Friedemann personally handwrote the NEW Commerzbank accounts.

27         On June 29, 2010, Friedemann emailed Bradford with a note and attached a copy of the new

28    account he and Defendant had at Commerzbank.  Friedemann wrote:

1          "I got all the numbers from the CommerzbankBank and filled in the

2          IRS form that you had kindly prepared.  Handwriting only, I'm sorry."

3          Bradford wrote a note in response to Friedemann's note.  Bradford wrote:

4          "This is email related to 2009 FBAR.  Friedemann did not provide update

5          for me to prepare Form TD F 90-22.1.  So, I pointed him to the form and

6          told him to file himself and to update for NEW accounts."

7      Both Krozek and Bradford prepared Forms TD F 90-22.1 each year from 1993 through 2008

8 reflecting the Commerzbank account and it being in the name of Friedemann.  For the year 2009,

9 Bradford sent the pre-printed TD F 90-22.1 to Friedemann and Friedemann handwrote the NEW

10 accounts and balances which were transferred from Sarasin into Commerzbank.  There is no

11 dispute that all income from the Commerzbank account was properly reported each year.

12      Friedemann and Defendant did not – and still do not - own a television nor a subscription for

13 a newspaper.  Their sole form of news gathering is via the radio on NPR while driving or, in more

14 recent years, the Internet.  However, when on the Internet, Friedemann and Defendant routinely

15 looked at scientific websites, not at Yahoo News, general business or news sites.  Their world is

16 science, creative writing, and staying abreast of scientific and literary matters that intrigue them.

17      Friedemann and Defendant were audited for their 1998 and 2001 Forms 1040 for business

18 expenses.  Both audits resulted in refunds of about $4,000 and $6,000 respectively because of their

19 failure to claim all of their business expenses on their original returns as filed.  The Defendant and

20 Friedemann were never questioned by the IRS Agent about foreign holdings or income and the

21 agent never questioned why FBARs were not filed.  The auditor talked to both Friedeman and

22 Defendant but did not mention "FBAR".  They do not have any recollection that they ever talked

23 about FBARs with any auditor.  Neither Defendant nor Friedemann even know the abbreviation

24 FBAR and what it means.  However, they clearly remember that, for the meeting with the auditor,

25 Defendant had brought a shopping cart containing one copy of every book she had published in

26 Japanese and in German by that time – more than 23 books – and of all translations of these books

27 into different European languages by various translators.  At that time, the IRS had questioned why

28 Defendant declared so many expenses for her literary work (which had produced very little

Verified Answer to Complaint and Affirmative Defenses

1  income).  After Defendant had shown to the auditor the sheer volume of her literary work during so

2  many years, the auditor accepted their tax return.

3      Friedemann and Defendant are both very intelligent professionals and well-respected by

4  their peers.  Although Friedemann and Defendant have no problem speaking and understanding

5  English, which is their third language, they are wholly unfamiliar with legal, technical, and tax

6  concepts.  For that reason, they rely completely on tax and accounting professionals.

7      Part of their naivety with finances and taxes surely has to do with them growing up in "old"

8  countries, Germany and Japan.  There, in the upper echelons of society, money is just not talked

9  about.  It's even considered under one's dignity.  When you are offered a job, you don't try to

10  negotiate your salary.  You trust and accept that the offer is fair.  They are ignorant in

11  buying/selling stocks or other investments.  As they were raised, you were taught and expected to

12  just deposit money into the bank, trust and let the bank do all the managing.  That is why they gave

13  the power of attorney to Sarasin and Commerzbank to manage their accounts.  Before coming to

14  the United States, they had never heard of private people engaged in buying and selling stocks.

15      Although Friedemann and Defendant are graduates with multiple degrees and admiration

16  from their peers, they have no expertise in business or taxes.  The best way to describe Friedemann

17  and Defendant are as idiot savants.  They are unique and seemingly contradictory people.  On one

18  hand, in their areas of expertise, they are the most knowledgeable and capable people you will ever

19  meet.  Their familiarity with their areas of expertise is encyclopedic, and their ability to quote

20  abstruse scientific laws and principles from memory is remarkable.  On the other hand, in other

21  areas, particularly that of business, finance, and taxes, they are utterly childlike, guileless, and

22  naïve.  These seemingly contradictions in their character can best be understood by considering

23  them to be more subtle examples of the character played by Dustin Hoffman in the movie, "Rain

24  Man."  Friedemann and Defendant, although not autistic, are abnormally talented in scientific and

25  artistic areas but on the planet Mars when it comes to business, finance, and taxes.  They are

26  unusual in many respects.  They live a very simple life, surrounded by books and computer

27  screens.  Defendant's library contains more than 10,000 books in three languages, many with

28  handwritten notes and comments along the margins.  They don't entertain guests because they

1   work so much that they simply don't have time.  "Working" however does not mean that they do

2   jobs which earn money.  They work out of an inner drive to pursue the projects – literary and

3   scientific – to which they have dedicated their lives, irrespective whether or not they lead to

4   financial gain.  In fact, they are living on their social security income and on whatever they had

5   saved in earlier years.  They haven't gone on a vacation since 1996.

6        Friedemann and Defendant filed their United States personal tax returns each year on a

7   timely basis with the professional help of C.P.A.s Krozek and then Bradford.  Although

8   Friedemann became a United States citizen in 2001 and Defendant became a United States citizen

9   in 2007, for each year at issue, since Defendant was at least a resident, they were both obligated to

10  file U.S. tax returns.  The Defendant and Friedemann were quite aware that the income tax rate that

11  was withheld on their Swiss income was 35%.  In reviewing their tax rates, prior to the inclusion of

12  the Swiss income, their Federal income tax rates were:  2005 – 15%; 2006 – 0%; 2007 – 15%;

13  2008 – 0%; and 2009 – 10%.  If the Defendant and Friedemann were truly attempting to evade or

14  reduce taxes, they would have sought advice on how to transfer their Swiss funds from Switzerland

15  to the United States, where they would have paid less income tax because of the lower rates.  In

16  1995, Defendant inherited approximately 732,000 Swiss francs from her father's estate in Japan.

17  This inheritance had been duly taxed in Japan before being transferred to Defendant's account.

18  This inheritance was not taxable to Defendant.  (See, §2001).  Neither Friedemann nor Defendant

19  were U.S. citizens.  They were still citizens of Germany and Japan, respectively.  However, they

20  were U.S. residents by virtue of Friedemann working for NASA and they were living in California.

21  When Friedemann and Defendant were deciding where to transfer Defendant's inheritance, they

22  thought of three countries – United States, Germany and Switzerland.  They had no need for the

23  inheritance at that time and knew they would leave it to Mino.

24        Defendant deposited her inheritance from her father into an account at Sarasin Bank she had

25  opened solely in her name in 1985.  When Defendant opened the Sarasin account in 1985, she was

26  living in Germany with Friedemann, where he was a professor.  When Defendant opened this

27  account, she had no connection to the United States.  She was a Japanese citizen living in Germany

28  with her husband.

Verified Answer to Complaint and Affirmative Defenses

1    Defendant could have deposited her inheritance into their U.S. account but for reasons stated

2    herein it was deposited into the Sarasin account in Switzerland.  Neither Friedemann nor

3    Defendant sought financial or tax advice on where to deposit her inheritance.  Because of

4    convenience, and their plan to leave Defendant's inheritance to their only heir Mino, Friedemann

5    and Defendant decided to leave her inheritance at Sarasin.

6    Mino had gone to college and graduate school at the ETH in Zurich, considered the MIT of

7    Europe.  Mino loved Switzerland and intended to eventually live in Switzerland.  Friedemann and

8    Defendant discerned that the logical place to deposit Defendant's inheritance was in Switzerland.

9    Friedemann and Defendant were aware that they would be subject to a flat income tax rate of 35%

10   in Switzerland on any income generated from that account.  Friedemann and Defendant were also

11   aware that the income tax rate in Switzerland was higher than the income tax rate the Defendant

12   and Friedemann paid in the United States on their investment income.  Also, they were still not

13   U.S. citizens in 1995, only residents of the U.S.

14   Also, at this time in 1995, Mino was negotiating a professorship position in Switzerland and

15   he had met a young woman whom he wanted to marry.  Both Friedemann and Defendant still had

16   their Japanese and German citizenships.  Friedemann was close to retirement age being 62, and

17   they were both seriously thinking about retiring in Switzerland.  For the above reasons Defendant

18   deposited her inheritance into Sarasin.  They left the money in Sarasin without ever touching it or

19   taking money out.  In fact, Friedemann and Defendant were so absorbed in their own work,

20   Friedemann as a scientist at NASA and Defendant as a published author and novelist, and so

21   detached from the account in Switzerland at Sarasin, that they signed over Power of Attorney to

22   Sarasin to manage the account on their behalf.  They even asked the bank to just furnish them with

23   an annual report rather than standard monthly reports.  Both the statements from Commerzbank

24   and Sarasin were mailed to the Defendant and Friedemann at their residence in the United States.

25   They did not have the statements sent to a different address or nominee.  The Swiss account was

26   managed by the financial institution.  There was no specific investment advisor to the account.

27   Neither Friedemann nor Defendant had any involvement in the management of the investments in

28   the Sarasin account.  In fact, the Defendant and Friedemann did not know whether the Sarasin

1   account held stock, bonds, securities, or just cash.

2       Neither Switzerland nor Germany requires the filing of an income tax return. For dividends,

3   interest, and capital gains, the tax is automatically withheld from the income at the rate of 35% for

4   Switzerland. Since the withholding of taxes on investment income was at the source, and they

5   would not have any deductions to match against the investment income, there was no need to file

6   an income tax return in Switzerland. They were never given any guidance or advice from any

7   bank official in Switzerland on whether there was any different reporting requirement in the United

8   States. When Defendant received her inheritance in 1995, neither she nor Friedemann were U.S.

9   citizens, and they planned on returning to Switzerland very soon after Friedemann retired. The

10  only reason they did not return to Switzerland was that Mino took a temporary position in the

11  United States, was living on their property in Los Altos, they were a very close family, and

12  Friedemann and Mino were collaborating on research and papers together.

13      Defendant first started banking at Sarasin in 1981 when Mino was a student in Switzerland.

14  She was looking for a local, reliable, trustworthy bank. Sarasin was recommended to her by the

15  late Professor Emil Brunner, one of the most eminent protestant theologians of the 20th century,

16  whom she had met years earlier in Japan but who had returned to his native Switzerland, living in

17  Zurich. Defendant deposited her inheritance at Sarasin in 1995 because she thought she would

18  soon be living in Switzerland permanently.

19      Defendant presented her Japanese identification and passport when the account was opened

20  at Sarasin in 1985. She was neither a U.S. citizen nor a U.S. resident. She did not ask for a

21  numbered account. Defendant signed standard documents to open the account. There was no need

22  to sign any documents to notify the United States because she was not a U.S. citizen or resident.

23  No bank official discussed any U.S. reporting obligation, and she was not informed enough to ask

24  about reporting requirements in the United States. She was by herself when she opened the

25  account. The Sarasin account with her inheritance was in her name only. The investment account

26  was managed by Sarasin Bank. There was no specific investment advisor assigned to the account.

27  She had no involvement in managing the investments. Once again, Defendant had no finance or

28  tax knowledge and relied solely on Sarasin Bank to manage her account. She had never had this

1    type of account with any assets in it to manage. She was never given any guidance from any

2    official of the bank in Switzerland on whether there was a reporting requirement to the United

3    States or any taxing agency.

4            While Friedemann was studying in Geneva, Switzerland, he opened a small personal

5    account at Sarasin Bank ("Sarasin"). When he opened this account in 1959, Friedemann was a

6    German citizen and presented his German identification and passport and signed standard

7    documents to open the account. The account was opened solely in Friedemann's name.

8    Friedemann did not open a numbered account. From his opening the Swiss account at Sarasin

9    Bank until 1995, the account usually had less than 2,000 Swiss francs and never reached 5,000

10   Swiss francs. Defendant and Friedemann never withdrew money out of this Swiss account after

11   1990 when Mino had finished his PhD-level studies in Switzerland. Friedemann kept the Swiss

12   account open because their son, Mino, was attending college in Switzerland. There have been no

13   deposits into the Swiss account since Defendant's inheritance. Friedemann left the account open

14   because his son, Mino, was attending college in Switzerland and this allowed them to have access

15   to it when they were in Switzerland. Since Friedemann and Defendant had many friends in

16   Switzerland and their only son Mino attended the Swiss Federal Institute of Technology (ETH)

17   from his freshman year through is Ph.D., they kept the account open. Friedemann and Defendant

18   would sojourn to Switzerland to visit their son, friends, and/or Friedemann would engage in

19   academic collaborations. In the 1980's in Europe, credit cards were not widely used but bank

20   cards were. This was another reason for Friedemann leaving the Swiss account open.

21           Neither Friedemann nor Defendant ever thought they had a numbered account, in Germany

22   or in Switzerland. The accounts at Commerzbank and Sarasin were all opened while Friedemann

23   was a citizen and resident of Germany, and Defendant was a citizen of Japan and resident of

24   Germany. At no time did the Defendant and Friedemann open a foreign bank account while U.S.

25   citizens or residents. The Commerzbank accounts were opened in 1923 by Friedemann's father

26   and in the late 1950s by Friedemann. While Friedemann was a student in Switzerland in the early

27   1950s, he had a bank account there which became the Sarasin account in the early 1980s, while

28   Friedemann was a professor in Germany. At that time, Friedemann and Defendant often visited

1   Mino while he was in college and a doctoral candidate in Switzerland between 1981 and 1990.

2       Friedemann and Defendant are both naive to "numbered" accounts.  Their first knowledge of

3   numbered accounts arose in recent discussions with their legal team in filing this protest with the

4   Internal Revenue Service when they were asked when they opened numbered accounts.  In fact,

5   Defendant disputes that the Sarasin account was numbered.  In her mind, it is obvious that, for the

6   sake of bookkeeping, ANY bank account has to have a number.  She also thought that ANY bank

7   account has to have a name.  How else would the bank know who the account owner is?  The

8   statements were sent to her in San Francisco at her address and the statements were in her name.

9   In 2004 she asked that only an annual statement be sent because she never looked at the quarterly

10  statements.

11      Defendant and Friedemann never consciously kept any money or assets in an account

12  separate.  It was their belief that they both were on the accounts, and both had equal access to the

13  accounts.  Hence, in their minds, each had equal power and ownership of the accounts.

14      Apparently, Defendant was the only person named on the Sarasin account where she

15  deposited her inheritance, and if that were done, it was done by Sarasin when she opened the

16  account in 1985, which would have been purely a formal or formalistic reason. Defendant was and

17  still is unfamiliar with banking.  She signed papers which were provided to her by the bank officers

18  at Sarasin Bank.

19      Although it appears that there were four accounts opened at Commerzbank in Switzerland,

20  this was done completely by the process between Sarasin Bank and Commerzbank.  In the summer

21  of 2009, in response to the actions taken by the U.S. Government against all Swiss banks, Sarasin

22  was demanding that the funds in Sarasin Bank be transferred to another bank immediately.

23      At this time, Friedemann and Defendant were in panic about Mino's brain tumor.  Being

24  concerned about bank transfers was the last thing on their minds. Mino was born February 1, 1962,

25  in Pennsylvania.  After Mino's birth, the family moved to Germany in the summer of 1962, where

26  Friedemann became a full-time professor for 23 years.  Mino enrolled in college in 1981 and for

27  the next ten years did his college and postgraduate studies in Switzerland, eventually earning his

28  doctorate degree in physics.

Verified Answer to Complaint and Affirmative Defenses

1    Upon completion of his doctorate degree in 1990, Mino accepted a post-doctorate position in 1991

2    with the joint NASA-Japan Satellite Mission IRTS, splitting time between NASA and the Japanese

3    Space Agency (ISAS).  Mino was fluent in German, English, French, and Japanese.  Mino joined

4    the University of California in Berkeley to work on a USA-Japan satellite program.  He spent the

5    next 10 years splitting his time between the Japanese Space Agency ISAS, UC Berkeley, and

6    various NASA centers.  Mino was asked to join the NASA Goddard Space Flight Center in

7    Maryland for his expertise to contribute to the SOFIA project, a flying astronomical telescope

8    mounted in a Boeing Jumbo jet.  In 2002, Mino became a civilian scientist for the Air Force

9    Research Laboratory in Dayton, Ohio.  Then, in 2006 he returned to NASA, specifically to the

10   NASA Ames Research Center as the Director of Nanotechnology and Advanced Space Materials.

11        Friedemann and Defendant purchased a home in Los Altos, California, which had an in-law

12   unit on their property.  Mino moved into the in-law unit.  This was convenient and perfect because

13   Friedemann and Mino collaborated in 12 joint publications in peer-reviewed scientific journals.

14   After Mino joined the NASA Ames Research Center in California, this intensified his scientific

15   collaboration with his father.  Friedemann and Mino were best friends.  Mino and his mother also

16   had a very close and loving relationship.

17        In June 2004, as a passenger in a car in Dayton, Ohio, while with the Air Force Research

18   Lab, Mino was involved in an auto accident that resulted in a severe concussion.  Since that time,

19   Mino suffered severe neck pain and headaches from the accident.  Friedemann and Defendant were

20   not medically educated, but from their observation and research, they were concerned.  This was

21   alarming to Friedemann and Defendant.  They worried about their son because he worked long

22   hours at the NASA Ames Research Center, had to travel on official NASA business for up to 200

23   days a year, and was under tremendous stress.  In May 2009, Defendant was on a trip with Mino.

24   Mino had such severe headaches that they had to cut the trip short.  In August 2009, Friedemann

25   and Defendant noticed that Mino's left-side lip was drooping, he could not control his saliva, and

26   his left hand was numb.  Mino drove to the Palo Alto Medical Foundation Emergency Room in

27   Palo Alto for an MRI.  On the next day, August 30, Dr. Paul Jackson, a neurosurgeon, told Mino

28   and Friedemann that Mino had a glioblastoma multiforme, grade IV, a tumor that arises from

1   astrocytes. These star-shaped cells make up the glue-like supportive tissues of the brain. These

2   tumors are highly malignant because the tumor tissue can never be fully removed by surgery and

3   the cells reproduce quickly. Dr. Jackson bluntly told Mino and Friedemann that, as scientists, they

4   would understand the situation and that Mino had, at most, 6 months to live. This explained the

5   headaches Mino had been experiencing since 2004.

6       Determined to fight the glioblastoma, Mino flew to New York City and tried a program of

7   Oriental medicine. This proved to be a false hope. Mino had difficulties and collapsed.

8   Friedemann and Defendant flew to New York to be with him and explore other options. While

9   there, they brought Mino to Columbia Medical School in New York City. There, the doctors were

10  able to remove over 99% of the tumor, which was the size of a man's fist. This was short-lived.

11  The tumor returned in four weeks. Friedemann and Defendant brought Mino back home. The

12  headaches and agony returned with a vengeance.

13      In December 2009, Friedemann and Defendant brought Mino to Hawaii where he saw

14  another specialist who assured Mino he could help him with the tumor and the headaches. Once

15  again, this was a false hope. What the Defendant, Friedemann, and Mino were experiencing were

16  hollow words and promises of a miraculous recovery. Each time their spirits and hopes would lift,

17  but on each occasion, the darkness was getting closer.

18      Friedemann and Defendant brought Mino home in February 2010 and were able to place

19  him at the University of California, San Francisco School of Medicine for the second surgery,

20  complete with six weeks of intense radiation at Stanford and chemo. In addition, he joined a

21  clinical trial at UC San Francisco with an experimental vaccine called "heat shock". The tumor

22  stopped growing for fourteen months. However, what the doctor failed to disclose was that the

23  heat shock vaccine was expected to work only for a limited time and that the tumor would return

24  with a vengeance. Mino was subjected to a third surgery on August 22, 2011. In fact, the doctors

25  were just looking to see how long Mino, as a patient, would survive after this experimental vaccine

26  treatment. They knew this would not cure Mino. Friedemann and Defendant were devastated

27  when they learned that their son was just a guinea pig.

28      In September 2011, Friedemann, Defendant, and Mino flew to Germany and tried another

1    vaccination protocol, officially approved in Europe but not in the United States.  This vaccine

2    killed the tumor but made the brain swell so much that the treatment had to be put on hold.  During

3    this time, the tumor reappeared, spreading to other parts of the brain.  By this time, Mino was fully

4    wheelchair-bound. Friedemann and Defendant then took him to New York to try a modified

5    version of the German vaccine.  On December 23, 2011 Mino was brought to El Camino Hospital

6    in Mountain View, California.  In early January 2012, Mino slipped into a coma and died two

7    weeks before his 50th birthday.  Mino survived for 29 months, almost two years longer than his

8    original prognosis, because of the love, time, and efforts of his parents and his fight to defeat this

9    cancer.  Friedemann's and Defendant's attention was totally absorbed by their intense worry about

10   their only son's life.  Since 2004, the original accident, even until today, they have been in constant

11   sorrow, despair, and grief.  Taxes were last on their minds.

12   Since 2004, however, their focus was on their son Mino, trying to help him to defeat the terrible

13   headaches and brain tumor.  This attention, devotion, and love helped prolong Mino's life for

14   almost two additional years.

15         Sarasin Bank told the Defendant and Friedemann they would sell the stock in the accounts

16   and transfer the cash to the bank of their choice.  Since Friedemann and Defendant owned the old

17   family account at Commerzbank in Germany, and Commerzbank had a Swiss subsidiary, it was

18   recommended by Sarasin Bank that it would first transfer the money to Commerzbank in

19   Switzerland.  After that, Commerzbank Switzerland would transfer the money to the

20   Commerzbank account in Germany.  It was not a decision by either Friedemann or Defendant.  The

21   Defendant and Friedemann asked Sarasin Bank how to accomplish this procedurally.  They put the

22   Commerzbank people in touch with the corresponding person at Sarasin Bank in order to figure out

23   how to best do the transfer.  If the Banks found it advisable to create four accounts for doing the

24   transfer, this was not a decision by either Friedemann or Defendant.  Faced with the terrible

25   diagnosis of their son's brain tumor, Friedemann and Defendant asked the people at Commerzbank

26   and Sarasin to do their best.  Commerzbank suggested to first "park" the money in the

27   Commerzbank subsidiary in Zürich and then transfer it to their old family account in Germany.

28         Since 1990, neither Friedemann nor Defendant personally visited the bank in Switzerland to

1    conduct any transactions.  However, from 1981 through 1990, when the Defendant and

2    Friedemann traveled to Switzerland to visit their son, they would take out nominal amounts to pay

3    for hotels and food while visiting.  In 1990, when their son took temporary job assignments in the

4    United States and then Japan, the Defendant and Friedemann no longer traveled to Switzerland.

5    Friedemann and Defendant had two Swiss accounts, neither was secretive or coded.  They were

6    made aware they could use coded, secretive, and encrypted methods to communicate with Sarasin

7    officials but never opted for that form of communication.  The Defendant and Friedemann were

8    always completely transparent and conducted all communications with the bank under their proper

9    names.

10    Once Defendant notified Sarasin Bank that she was a U.S. citizen, Sarasin Bank notified

11    them by email that the bank could no longer service their accounts.  Friedemann and Defendant felt

12    betrayed.  From their life experiences and those of their family and friends, they believed that the

13    only safe place in the world to have their money was in Switzerland.  The U.S. during this period

14    was going through a bank meltdown, and the stock market and financial markets needed

15    government assistance to survive.  The banks needed bailouts and brokerage houses were

16    collapsing.  Many banks went bankrupt.  The accounts at Sarasin Bank were eventually closed in

17    August 2009.  Friedemann and Defendant thought about transferring their funds to the United

18    States, but they were afraid they would lose their retirement nest egg and Mino's inheritance.  They

19    were forced to transfer it to Commerzbank, with no intention of hiding it.  They transferred it

20    because Sarasin Bank had informed them that the bank would no longer service accounts owned by

21    U.S. citizens.  Since Friedemann and Defendant had stopped visiting Switzerland because Mino

22    was no longer living there, they felt the safest place to transfer the money was to Commerzbank in

23    Germany, which they still maintained and received Friedemann's monthly German social security

24    benefits.

25    During the entire time that the Defendant and Friedemann had these two accounts open in

26    Switzerland, they had no meetings with any foreign investment advisors or other officials at

27    Sarasin Bank.  Friedemann and Defendant never transferred funds from the United States to their

28    Swiss bank accounts.  The Swiss dividends, interest, and capital gains were taxed at 35%, which

Verified Answer to Complaint and Affirmative Defenses

1  was a higher rate than if the earnings had been in the United States.  No tax returns were required

2  to be filed in either Switzerland or Germany on passive income since taxes were withheld at the

3  source.  Except for the deposit of Defendant's inheritance in 1995, neither Friedemann nor

4  Defendant made any deposit or withdrawal since 1990 after Mino left Switzerland.

5  For almost four decades Friedemann had a cordial relationship with Sarasin Bank at the

6  Zürich office and personally knew the bank officer.  He retired and a new one came in, whom

7  Friedemann and Defendant never personally met.  Then, in the mid-2000s, the United States

8  questioned Swiss bank secrecy laws.  The Swiss banks were accused of still hording Nazi gold.  In

9  response, many Swiss banks, including Sarasin, asked their U.S.-based customers to leave.

10  After Defendant became a U.S. citizen on July 7, 2007, and the Defendant and Friedemann

11  informed Sarasin Bank that Defendant was now a United States citizen, Sarasin Bank informed

12  Friedemann and Defendant it would no longer hold their funds since Defendant was now a U.S.

13  citizen and it was their new policy to not allow U.S. citizens to have deposits in their bank.

14  Friedemann and Defendant were told they had to withdraw their funds or transfer the funds to

15  another bank.  After some back and forth, on August 31, 2009, Friedemann and Defendant

16  complied and transferred their retirement "nest egg" to their old family account at Commerzbank

17  in Germany.  This ended up being a circuitous transfer.  Sarasin informed the Defendant and

18  Friedemann that it could not do a direct transfer to Commerzbank in Germany.  Accordingly,

19  Friedemann and Defendant directed Sarasin Bank to transfer the funds to a Swiss subsidiary of

20  Commerzbank and then there was a transfer to Commerzbank in Germany into their existing

21  Commerzbank account, the one that had always reported the income that was earned from that

22  account.  An email from Commerzbank dated September 9, 2009 confirms this.  The amount listed,

23  €349.900,00, which reflected the actual amount in the bank account at the nadir of the financial

24  crisis of 2008-2009.  The balance had dramatically decreased, representing a loss of more than

25  50%, from its original inheritance during this period.  However, Sarasin Bank forced Defendant to

26  close the accounts because they lived in the United States and had become U.S. citizens.

27  It is important to note that several years before the Defendant and Friedemann learned of the

28  IRS' Offshore Voluntary Disclosure Program ("OVDP"), Defendant's Swiss bank account was

1  dissolved and all funds were transferred to their account with Commerzbank in Germany, which
2  had ALWAYS been included in the Defendant and Friedemann' IRS tax returns.  If Defendant and
3  Friedemann were intending to hide assets, they surely would not have transferred the funds in the
4  Sarasin Accounts to a bank to which they were reporting income and Bradford was reporting on
5  FBARs each year.

6        None of the foreign bank account statements stated that U.S. tax could be due or that the
7  account had to be reported to the United States.  Also, they never received any letters from their
8  foreign banks about the bank being investigated by the United States or the foreign country was
9  requiring disclosure to the United States.  Friedemann and Defendant voluntarily, and without
10  hesitation, came forward when they realized their tax returns were not correct and there might be
11  additional forms required to be filed.

12       Five years **after** they had left Sarasin Bank, Sarasin Bank informed Friedemann and
13  Defendant that, although they were former account holders and no longer had accounts with the
14  bank, Sarasin Bank would turn them into the IRS as former account holders.  In unfamiliar
15  territory, they decided to join the OVPD.  Based on their experiences in Japan, Germany, and
16  relatives in the United States, the Defendant and Friedemann were fearful that the IRS might
17  perceive them as "hiding" money and go after them as criminals.

18       Friedemann and Defendant had never heard of the term FBAR and the FBAR requirements.
19  They were instructed in cover letters from Bradford to file forms, but they were never described as
20  FBARs.  What Friedemann and Defendant were aware of was that they were required to pay taxes
21  on income, which they did.  Friedemann learned of the new obligation to give notice of each
22  foreign account when he heard the requirement in March 2014 while driving to work and listening
23  to NPR.  Upon learning of the FBAR requirement, and knowing that each year their CPA only
24  prepared and filed for them Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts,
25  reporting the German account at Commerzbank, Friedemann and Defendant IMMEDIATELY
26  sought to gather information on what to do if there was an issue.  Accordingly, Friedemann
27  searched the Internet for a local Tax Attorney.  They were confused because they thought that they
28  were only required to report the German income.  In the process of their returns being prepared by

1  Bradford, he sent them a cover notice informing them about the filing of the TD F 90.22-1.  There

2  was no mention by Bradford of a requirement to file the FBAR.

3       After Friedemann and Defendant learned that there was IRS enforcement action against

4  Defendant and Friedemann with undisclosed foreign bank accounts, they realized how complicated

5  the law was, and they sought the advice of a tax attorney.  They were very concerned since they

6  realized that for years they had not reported the income from Switzerland although they had paid

7  tax at the rate of 35% and believed this satisfied their tax requirements.

8       Friedemann found a local tax attorney and made an appointment with Douglas Scott

9  Meynard ("Meynard").  Friedemann and Defendant visited Meynard on May 9, 2014, at his law

10 office in San Jose, California.  They explained the issue to Meynard.  To their total surprise,

11 Meynard advised them to do nothing regarding the past filings but to make sure that they filed

12 future forms.  For this meeting, the Defendant and Friedemann paid Meynard $575.00 by credit

13 card, a copy of which was supplied to the Agent during the audit.  Friedemann and Defendant were

14 very uncomfortable with his advice and questioned Bradford, who had prepared and electronically

15 filed their annual income tax returns and Form TD F 90-22.1.

16       Bradford did some investigation and offered the names of three local attorneys.  In looking

17 specifically for someone with FBAR experience, the Defendant and Friedemann chose Mr. Jeff

18 Kahn ("Kahn"), whom they did retain and who communicated with the IRS on their behalf.  Kahn

19 purported to be an expert on filing FBARs.  Kahn filed amended income tax returns and all

20 documents required by the IRS, including Forms 114, FBAR.  Kahn told Friedemann and

21 Defendant that since they transferred their Sarasin nest egg to their old Commerzbank account five

22 years earlier and solely upon the request from Sarasin (which no longer wanted to have U.S.-based

23 customers), the IRS discerned that the Commerzbank account was now "contaminated with dirty

24 money" and the IRS was getting nasty.

25       Friedemann and Defendant had always reported the income from their German

26 Commerzbank account.  Friedemann was told by officials of the German bank that even though he

27 was not yet a U.S. citizen, his income and information was reported to the United States.  On the

28 other hand, for the account that Friedemann had opened many years ago in Switzerland, no one

1   ever told him about an obligation to report the assets to the United States.  The amount was always

2   less than $10,000.00 until Defendant deposited her inheritance from her father's estate in 1995.

3   She was not a U.S. citizen, and no one told her that as a resident of the United States she had to

4   report the account to the United States.  She did tell the bank official she and Friedemann were

5   planning on moving to Switzerland soon.  No official from the bank ever talked to Defendant about

6   reporting the passive income earned to the United States.  She never even thought about a reporting

7   requirement since she was only a resident of the United States.  And, the income was being taxed

8   in Switzerland at 35% and she had no familiarity with income tax laws in the United States about

9   foreign tax credits and alternative minimum tax.

10      On May 29, 2014, five years after her Sarasin account had been closed, Defendant sent a

11   letter to Mr. Ruedi Suter, VP ("Suter") at Sarasin.  In the letter Defendant brought to Suter's

12   attention how they selected Sarasin.  Two of the reasons were Sarasin was a small private bank

13   which had been recommended to them by a trusted friend and mentor, the late theologian Emil

14   Brunner, and they also "liked and trusted its promise of total confidentiality."

15      In that letter, the second to the last paragraph is a sentence that the IRS found conclusive

16   evidence that the Defendant and Friedemann sought to hide their money from the IRS.  The letter

17   states:  "In return we expect that Bank J. Sarasin, Ltd., and/or Bank J. Sarasin, AG do not disclose

18   my name to anybody, in particular to any US Government authority."  What Defendant meant to

19   say is that, five years after her Sarasin account had been closed and all funds duly transferred to the

20   fully declared Commerzbank account in Germany, this had become a "no-question" and she

21   pleaded with the Sarasin Bank not to betray her because she had faithfully followed all instructions

22   by the Sarasin Bank, when she was asked to close her Sarasin account.  The position of the IRS in

23   their FBAR Penalties Report dated October 15, 2019, is very disingenuous and deceitful.  The IRS

24   failed to mention what Defendant quoted in the paragraph above this particular passage, which is

25   supported by court cases, are the IRS's own Treasury Regulations, and Circular 230.  In fact,

26   Defendant did not write in her own words but quoted existing wording taken from IRS sources:

27          "I have been advised by legal counsel not to sign the 'Confirmation of

28          tax compliance', addressed to "Whom it may concern", which you sent me.  I

1    have also been advised by legal counsel not to sign the 1 ½-page waiver,

2    which states in its last paragraph 'I agree that your Bank is authorized to

3    provide all relevant information…'."

4    Friedemann and Defendant have fully cooperated with the IRS in all aspects of the audit,

5    interview, authorizations, and extending statutes of limitation for collection.  When asked by the

6    Agent for permission to communicate with their CPA, Bradford, Friedemann and Defendant, on

7    December 12, 2018, they sent a letter to Bradford which stated:

8    "Dear Mr. Bradford

9    This is my authorization that Kerry Bradford, CPA release a copy of

10    all physical and digital records including copies of tax filings and email

11    communications between Friedemann Freund and Kerry Bradford, CPA in

12    his possession that have been requested by the Internal Revenue Service for

13    tax years 2005-2009.

14    Sincerely,

15    Friedemann Freund

16    Hisako Matsubara"

17    62.    Defendant admits that this action is timely commenced.

18    63.    Defendant admits that the statute of limitations for assessment of an FBAR penalty is six

19    years from the date of the violation as defined in 31 U.S.C. §  5321(a)(5).

20    64.    Defendant admits that, absent a Reasonable Cause for late filing, Defendant was required to

21    file FBARs for the 2005 through 2009 calendar years by June 30, 2006, June 30, 2007, June 30,

22    2008, June 30, 2009, and June 30, 2010, respectively.

23    65.    Defendant admits that the statute of limitations for assessing FBAR penalties would have

24    naturally expired on June 30, 2012, June 30, 2013, June 30, 2014, June 30, 2015, and June 30,

25    2016, respectively.

26    66.    Defendant admits that on December 3, 2014, Defendant consented to extend the statute of

27    limitations for assessing the FBAR penalty for calendar years 2005 through 2009 to December 31,

28    2016.

Verified Answer to Complaint and Affirmative Defenses

1    67.    Defendant admits that on February 27, 2012, Defendant consented to extend the statute of

2    limitations for assessing the FBAR penalty for calendar years 2005 through 2009 to December 31,

3    2017.

4    68.    Defendant admits that on November 4, 2016, Defendant consented to extend the statute of

5    limitations for assessing the FBAR penalty for calendar years 2005 through 2009 to December 31,

6    2018.

7    69.    Defendant admits that on April 10, 2018, Defendant consented to extend the statute of

8    limitations for assessing the FBAR penalty for calendar years 2005 through 2009 to December 31,

9    2019.

10    70.    Defendant admits that on May 16, 2019, Defendant consented to extend the statute of

11    limitations for assessing the FBAR penalty for calendar years 2005 through 2009 to December 31,

12    2020.

13    71.    Defendant admits that on November 29, 2019, Defendant consented to extend the statute of

14    limitations for assessing the FBAR penalty for calendar years 2005 through 2009 to June 30, 2021.

15    72.    Defendant admits that on February 1, 2023, Defendant consented to extend the statute of

16    limitations for assessing the FBAR penalty for calendar years 2005 through 2009 to December 31,

17    2024.

18    73.    Defendant admits that on October 5, 2023, a delegate of the Secretary of the Treasury timely

19    assessed civil penalties against the Defendant due to the Defendant's willful failure to timely file

20    FBARs to disclose the Sarasin Accounts to the IRS for the calendar years 2005 through 2009

21    ("FBAR Penalties").  In addition, Defendant filed timely FBARs for the calendar years 2005

22    through 2009 because of Reasonable Cause for late filing.

23    74.    Defendant admits that for the calendar years 2005 through 2009, the high balances for the

24    Sarasin Accounts were $1,267,133.10 for 2005; $1,267,133.10 for 2006; $1,273,879.34 for 2007;

25    $1,178,039.04 for 2008; and $977,173.63 for 2009.  Defendant denies that she failed to file timely

26    reports.

27    75.    Defendant admits that if Defendant were willful in failing to file FBAR reports for 2005

28    through 2009, the correct FBAR penalties assessed against the Defendant would total $636 940.00,

1  which is 50% of the maximum account balance for the 2007 calendar year ($1,273,879). This total

2  amount is within the penalty limits set by 31 U.S.C. § 5321.

3  76.     Defendant admits that a delegate of the Secretary of the Treasury sent a notice of the

4  assessments and demand for payment to the Defendant for the FBAR penalties at her last known

5  address.

6  77.     Defendant admits that despite the notice and demand for payment, the Defendant failed to

7  pay the full amount of the FBAR Penalties proposed by the United States.

8  78.     Defendant admits that if she is liable for the willful failure to file timely FBAR reports for

9  2005 through 2009, the Defendant owes late-payment penalties pursuant to 31 U.S.C. § 3717(e)(2),

10  interest pursuant to 31 U.S.C. § 3717(a), and any applicable collection related fees pursuant to 31

11  U.S.C. § 3717(e)(1).

12  79.     Defendant admits that if she is liable for the willful failure to file timely FBAR reports, that

13  as of May 1, 2025, the unpaid balance owed to the United States by the Defendant for the FBAR

14  penalties, the late-payment penalty, applicable fees, and interest, less any payments, is

15  $715,152.73.

16  80.     Defendant denies that the United States is entitled to a judgment against the Defendant for

17  $715,152.73, as of May 1, 2025, plus pre-judgment and post-judgment statutory accruals as

18  provided by 31 U.S.C. §§ 3717(a), (e), and 28 U.S.C. § 1961, from the date of the judgment until

19  paid in full.

20  <u>**AFFIRMATIVE DEFENSES**</u>

21      Without assuming any burden of proof that the law places on Plaintiff, Defendant asserts the

22  following affirmative defenses in the alternative as separate and distinct affirmative defenses to

23  each and every purported cause of action contained therein and does not constitute an admission of

24  liability or of any factual allegation not expressly admitted above.

25  <u>**FIRST AFFIRMATIVE DEFENSE**</u>

26  **Failure to State a Cause of Action**

27      The Claim fails to state facts sufficient to constitute a Cause of Action against the

28  Defendant.

## SECOND AFFIRMATIVE DEFENSE

### Failure to Establish "Willful" Conduct

Plaintiff's claims are barred or limited because Defendant did not act willfully within the meaning of 31 U.S.C. § 5321(a)(5).  A willful FBAR violation requires proof of either actual knowledge, reckless disregard, or willful blindness.  In addition, Defendant's actions do not amount to a "voluntary, intentional, violation of a known legal duty" as is required to sustain a "willful" penalty under 31 U.S.C. § 5321(a)(5).  Defendant's conduct satisfies none of these standards.

Defendant did not willfully fail to file FBARs for the years at issue.  She lacked actual knowledge of the FBAR requirement as it applied to her Sarasin Accounts and did not act with reckless disregard or willful blindness.  At all times, she believed in good faith that her tax obligations were being properly handled by her longtime CPAs, Krozek and Bradford.

Specifically, Defendant relied on professional advice from two licensed CPAs: first, Philip Krozek, and later, Kerry Bradford.  Neither CPA ever advised her that the Sarasin Accounts needed to be separately reported on an FBAR.  Both CPAs were aware of the Commerzbank account in Germany, and that account was consistently disclosed and reported.  The Sarasin Accounts were not hidden from any adviser; the Sarasin Accounts simply were not flagged or discussed as reportable, due to a shared misunderstanding of the filing requirements.

The Sarasin Accounts were opened in Defendant's legal name in 1985, before she became a U.S. citizen.  It was funded exclusively by a family inheritance from Japan and remained largely dormant for years.  In 2009, when Sarasin Bank instructed Defendant to close the account due to U.S. regulatory policy, she did so, transferring the funds to the family's existing Commerzbank account, which was properly reported on that year's tax return and FBAR.  At no time did Defendant attempt to conceal the account, use aliases, create shell structures, or engage in any conduct suggestive of secrecy or evasion.

There is no evidence of affirmative concealment, misrepresentation, nominee structures, or coded communications.  Defendant's conduct is inconsistent with any inference of willfulness.  Upon first learning of the FBAR filing obligation in March 2014, Defendant took immediate

corrective action.  She contacted her CPA, retained legal counsel, voluntarily disclosed the Sarasin Accounts through the IRS's compliance framework, filed amended income tax returns and delinquent FBARs, and paid all taxes and interest owed, years before any audit or enforcement action.

Defendant's actions are fundamentally inconsistent with willfulness.  In Bedrosian v. United States, the district court found no willful FBAR violation where the taxpayer voluntarily disclosed a second unreported account, filed amended forms, and fully cooperated with the government. Defendant's facts are materially similar: she disclosed, amended, and cooperated — all before any IRS inquiry.

Even to the extent the government may argue that Defendant "should have known" of the FBAR obligation because she signed returns referencing foreign accounts, the law requires more than that.  Courts have recognized that a taxpayer's signature on a return is at most prima facie evidence of knowledge, and that willfulness remains a fact-intensive question.  Here, Defendant believed — albeit mistakenly — that reporting the Commerzbank account and its income fulfilled her obligations.  She had no training in tax law, was naturalized only in 2007, and relied in full on professionals.  She did not knowingly or recklessly disregard a known legal duty.

In sum, the government cannot meet its burden of proving willfulness under any recognized standard.  Defendant's conduct was at most negligent, and any penalty imposed must fall under the non-willful regime of 31 U.S.C. § 5321(a)(5)(B), capped at $10,000 per account per year and further subject to reduction for reasonable cause.

### THIRD AFFIRMATIVE DEFENSE

### Reasonable Cause and Good Faith Reliance

Any failure by Defendant to file FBARs for the Sarasin Account during the years 2005 through 2009 was due to reasonable cause and was not the result of willful neglect. Accordingly, under 31 U.S.C. § 5321(a)(5)(B)(ii), no penalty may be imposed.

Defendant acted at all times with ordinary business care and prudence. She reasonably relied on the advice of two competent Certified Public Accountants—first, Philip Krozek, and later, Kerry Bradford—both of whom had long-standing professional relationships with the family and

Verified Answer to Complaint and Affirmative Defenses

1   prepared their tax returns and foreign bank account reports.  Neither CPA ever advised Defendant
2   that the Swiss Sarasin Accounts needed to be reported on an FBAR.  She relied on their judgment
3   and followed their instructions in good faith.
4         Throughout the relevant years, Defendant and her husband timely filed all required federal
5   income tax returns.  They accurately reported all interest and dividend income from their German
6   Commerzbank account, which was fully disclosed on Schedule B of each Form 1040.  FBARs
7   were also filed annually for that account, and the associated income was taxed accordingly.
8         Defendant provided her CPAs with all documentation she believed was relevant, including
9   foreign bank statements and income summaries.  She did not withhold any information that was
10  requested.  Her CPAs had full access to her prior filings and were aware of the existence of foreign
11  accounts.  Any failure to report the Sarasin Accounts was the result of an honest
12  misunderstanding—one shared by her professional advisors—not an effort to mislead or conceal.
13        Defendant is an elderly, naturalized U.S. citizen with no training in U.S. tax law or financial
14  regulation.  English is her third language, and she has never taken a course in tax, business, or
15  accounting.  During the years in question, she and her husband were also facing extreme emotional
16  and caregiving challenges, as their only son, Minoru Freund, was severely injured in a car accident
17  on June 1, 2004, while he was working at the Air Force Research Laboratory in Dayton, Ohio.
18  Mino suffered a serious neck and brain injury that affected him for years to come and forced him to
19  undergo continuous treatment by chiro practitioners for the rest of his life.  Mino was diagnosed in
20  August 2009 with a terminal brain cancer (glioblastoma multiforme, grade IV) from 2009 until his
21  death in early 2012.  The stress of his illness and Defendant's caretaking responsibilities made her
22  even more dependent on her CPA to ensure full compliance in all tax related questions and matters.
23        Defendant's good-faith reliance on experienced professionals, her consistent reporting of
24  foreign income and accounts where instructed, and her voluntary corrective action upon learning of
25  the FBAR obligation collectively establish reasonable cause.  As soon as she became aware of the
26  requirement in 2014, she contacted her CPA, retained legal counsel, disclosed the Swiss Accounts
27  to the IRS, filed amended tax returns and FBARs, and paid all tax and interest due.  She did so
28  voluntarily and proactively, years before any enforcement action began.

1  Considering all of the facts and circumstances—her personal background, longstanding

2  compliance history, complete cooperation with the IRS, and timely correction of the oversight—

3  any noncompliance was by the Defendant the result of an honest misunderstanding, not willful

4  neglect or disregard.  Under applicable law, including Treasury Regulation § 1.6664-4(b)(1),

5  Defendant's conduct demonstrates reasonable cause and good faith, and the penalties must be

6  abated.  In fact, Bradford testified that he thought the oversight was because of their tax ignorance

7  and not willful.

8  ## FOURTH AFFIRMATIVE DEFENSE

9  ### Unconstitutionally Excessive Penalty - Eighth Amendment)

10  The FBAR penalties assessed against Defendant are grossly disproportionate to the gravity

11  of the alleged offense and violate the Excessive Fines Clause of the Eighth Amendment to the

12  United States Constitution.

13  Defendant's alleged violation was a first-time, good faith reporting error involving a

14  longstanding Swiss bank accounts that were opened in her own name in 1985 and funded solely

15  with a lawful inheritance from her father in Japan.  The account was passive and subject to Swiss

16  withholding tax at 35%.  Defendant received no financial benefit from the failure to file FBARs

17  and paid all U.S. income taxes and interest due upon discovery of the oversight.

18  The IRS assessed a penalty totaling $636,940, representing 50% of the account's high

19  balance in 2007, and demanded additional statutory interest and late-payment penalties, for a total

20  liability exceeding $715,000.  This confiscatory sum exceeds 56% of Defendant's entire life

21  savings in that account.  Yet Defendant's conduct caused ZERO loss to the Treasury.

22  The Eighth Amendment prohibits the imposition of fines that are "grossly disproportional to

23  the gravity of a defendant's offense."  See United States v. Bajakajian, 524 U.S. 321, 334 (1998).

24  In Bajakajian, the Supreme Court struck down a forfeiture of $357,144 for failing to report cash at

25  customs, despite the legality of the funds and the absence of any criminal intent.  Like in

26  Bajakajian, Defendant's alleged violation was regulatory, not fraudulent, and the funds were

27  legally earned and lawfully held.

28  The parallels to Bajakajian are clear.  Both cases involved foreign-reporting violations by

Verified Answer to Complaint and Affirmative Defenses

1  individuals with no intent to defraud or conceal.  Both involved penalties untethered to tax loss or

2  damage to the government.  Here, as in Bajakajian, the fine is punitive and grossly exceeds any

3  proportional remedy.

4       The Eleventh Circuit has confirmed that the Excessive Fines Clause applies to FBAR

5  penalties.  In United States v. Schwarzbaum, 24 F.4th 1355 (11th Cir. 2022), the court remanded

6  an FBAR case to consider whether penalties calculated on high-balance years for unrelated

7  violations were disproportionate.  Like Schwarzbaum, the IRS in Defendant's case applied a peak-

8  year balance (2007) across a five-year period — compounding the penalty without connecting it to

9  the actual harm in each year.

10  In United States v. Colliot, No. AU-16-CA-01281-SS, 2018 WL 2271381 (W.D. Tex. May 16,

11  2018), and United States v. Wadhan, No. 1:17-cv-01287, 2018 WL 3181325 (D. Colo. June 28,

12  2018), federal courts rejected IRS attempts to impose FBAR penalties in excess of $100,000 per

13  year where regulations (31 C.F.R. § 1010.820) still capped the maximum.  Both courts

14  acknowledged the risk of disproportionate enforcement.

15       Even where willfulness is presumed, courts have reduced FBAR penalties due to concerns

16  over proportionality.  In United States v. Bittner, 19 F.4th 734 (5th Cir. 2021), rev'd on other

17  grounds, 143 S. Ct. 713 (2023), the court noted the need to align FBAR enforcement with both

18  statutory intent and constitutional boundaries.  Defendant's case is less egregious than Bittner, who

19  had dozens of accounts, yet received no caution, consideration, or penalty mitigation from the IRS.

20       The IRS's own guidance confirms that FBAR penalties should be mitigated based on facts

21  and circumstances.  The Internal Revenue Manual (IRM § 4.26.16.6.4) instructs examiners to

22  consider whether a penalty promotes future compliance and whether a warning letter is sufficient.

23  Defendant's advanced age, good-faith disclosure, lack of tax sophistication, and timely cooperation

24  with the IRS warranted mitigation — not maximum penalty imposition.

25       Defendant's culpability is minimal.  Her reporting failure was the result of an honest

26  misunderstanding and reliance on professionals, not an attempt to subvert U.S. tax laws. FBAR

27  penalties imposed in cases of fraud, shell corporations, and multi-million-dollar evasion have been

28  upheld as proportional.  But in this case, the government's penalty bears no rational relationship to

Verified Answer to Complaint and Affirmative Defenses

1   the violation or its harm.

2        Accordingly, enforcement of the FBAR penalty in this matter would violate the Excessive

3   Fines Clause of the Eighth Amendment.  Defendant asserts this constitutional defense not to seek

4   affirmative relief, but to bar enforcement of a penalty that serves no remedial purpose and would

5   effectively bankrupt a compliant taxpayer in the twilight of her life for an unintentional omission.

6        The Court should therefore declare the FBAR penalties unenforceable or, at minimum,

7   substantially reduce them to a constitutionally permissible amount proportionate to the actual

8   harm—if any—caused.

9                          **FIFTH AFFIRMATIVE DEFENSE**

10       **$100,000 Penalty Limit Pursuant to the IRS's Statutory Jurisdiction and Authority**

11       The relief exceeds the maximum penalty amount of $100,000.00 that the IRS may assess

12  pursuant to the IRS's statutory jurisdiction and authority under 31 C.F.R. § 1010.820.

13                         **SIXTH AFFIRMATIVE DEFENSE**

14                   **Violation of Due Process - Fifth Amendment**

15       Plaintiff's attempt to impose willful FBAR penalties against Defendant violates the Due

16  Process Clause of the Fifth Amendment because Defendant lacked fair notice of both the legal

17  obligation and the severe penalties being asserted.

18       Between 2005 and 2009, the FBAR reporting requirement was not reasonably knowable to

19  the average taxpayer.  It was obscure, seldom publicized, and poorly integrated into the tax

20  compliance framework.  Neither the FBAR nor Form TD F 90-22.1 was filed with the IRS, and its

21  filing requirement was embedded in a separate statutory and regulatory scheme under Title 31, not

22  the Internal Revenue Code.  For decades following its 1970 enactment, the FBAR obligation was

23  sporadically enforced, and only after the UBS scandal in 2009 did the IRS begin widespread

24  outreach.  Defendant's alleged violations predate that shift.

25       Even if the obligation to file was technically in effect, Defendant had no reasonable or

26  meaningful notice of the magnitude of the penalties now asserted.  The governing regulation in

27  force during the relevant years, 31 C.F.R. § 1010.820 (formerly § 103.57), explicitly capped willful

28  FBAR penalties at $100,000 per violation.  Although Congress amended 31 U.S.C. §

1   5321(a)(5)(C) in 2004 to increase the statutory maximum to 50% of the account balance, the

2   Department of the Treasury did not amend its implementing regulation for years.  Courts have held

3   that where an agency fails to update its regulation, the published cap remains binding.  See United

4   States v. Colliot, No. AU-16-CA-01281-SS, 2018 WL 2271381 (W.D. Tex. May 16, 2018); United

5   States v. Wadhan, No. 17-cv-01287, 2018 WL 3208157 (D. Colo. June 28, 2018).  A taxpayer,

6   reading the law, had every reason to believe that her maximum exposure—even if found liable for

7   willfulness—was $100,000, not five to six times that amount.

8         It is a fundamental tenet of due process that regulated parties must be able to understand

9   what the law requires of them.  See FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253

10  (2012).  The government's attempt to impose a penalty dramatically exceeding what its own

11  regulations stated at the time is the very definition of regulatory ambush.  Agencies must speak

12  clearly when consequences are severe.  See, also, Morton v. Ruiz, 415 U.S. 199, 232 (1974)

13  ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own

14  procedures.").

15        In addition to the lack of notice, the IRS's penalty assessment process was arbitrary and

16  capricious.  Initially, the IRS considered asserting five separate 50% penalties—one for each year

17  2005 through 2009—an approach that would have confiscated well over 100% of the account's

18  total value.  That "stacking" proposal was contrary to both the IRS's own mitigation guidelines and

19  basic notions of proportionality.  The Internal Revenue Manual (IRM § 4.26.16.6.4.1) expressly

20  cautions agents not to exceed 100% of the highest account value across all years.  It also directs

21  that mitigation be considered where the taxpayer cooperated, lacked intent, and had a history of

22  compliance — all of which apply to Defendant.

23        Only after pushback (including an administrative appeal) did the IRS modify its position and

24  apply a single 50% penalty based on the 2007 balance.  Even then, the agency failed to explain

25  why that year was selected, how it reflected the relative gravity of the conduct across years, or why

26  any mitigation was denied.  This suggests that the penalty was not based on a principled review of

27  facts and circumstances, but rather on a predetermined punitive objective.

28        In United States v. Jones, 2020 WL 4390390 (C.D. Cal. May 11, 2020), the district court

1    found an IRS FBAR penalty determination arbitrary and capricious because the agent used a high

2    balance from one year to justify penalties across multiple years without explanation.  The same

3    flaw exists here.  The IRS failed to document or explain its methodology in Defendant's case and

4    imposed the highest permissible penalty without individualized justification.

5          The IRS also ignored exculpatory evidence, including:

6                Third-party testimony from Defendant's CPA confirming her

7                misunderstanding;

8                Voluntary disclosure and amended filings made years before the

9                examination; Defendant's cooperation, including waiver of the statute of

10               limitations and production of complete records;

11               and Her lack of any prior noncompliance or financial sophistication.

12   Under these circumstances, the IRS's determination cannot be considered the product of reasoned

13   decision-making.  The penalty was assessed in violation of procedural fairness, consistency, and

14   proportionality standards guaranteed by due process.

15   Accordingly, enforcement of the penalty would violate the Fifth Amendment.  The Court should

16   decline to enforce the penalty and, at most, $100,000.00.

17                         **SEVENTH AFFIRMATIVE DEFENSE**

18                            **Statute of Limitations**

19         Some or all of the penalties assessed against Defendant are barred by the applicable statutes

20   of limitations governing both the assessment and collection of FBAR penalties.

21                          **EIGHTH AFFIRMATIVE DEFENSE**

22                              **Unlawful Penalty**

23         The penalties assessed against Defendant are unlawful and unenforceable to the extent they

24   exceed the regulatory cap set forth in 31 C.F.R. § 1010.820, which governed FBAR enforcement

25   during the years at issue.

26         Although Congress amended 31 U.S.C. § 5321(a)(5)(C) in 2004 to allow willful FBAR

27   penalties of up to 50% of the account balance, the Department of the Treasury did not amend its

28   corresponding regulation for many years.  The regulation in effect from 2005 through 2009 — then

1  codified at 31 C.F.R. § 103.57 and later recodified at § 1010.820 — explicitly capped the

2  maximum penalty for willful violations at $100,000.00 per account, per year.

3       Under established principles of administrative law, an agency is bound by its duly

4  promulgated regulations.  Unless and until the Treasury revised its rule to conform with the

5  amended statute, the regulation retained the force of law.  See United States v. Colliot, No. AU-16-

6  CA-01281-SS, 2018 WL 2271381 (W.D. Tex. May 16, 2018); United States v. Wadhan, No. 17-

7  cv-01287, 2018 WL 3208157 (D. Colo. June 28, 2018).

8       Defendant's alleged violations occurred between 2005 and 2009.  The regulation in force

9  during those years imposed a cap of $100,000.00 per violation.  Yet the IRS assessed a total

10  penalty of $636,940 — over six times the permitted maximum.  This assessment violates the

11  regulation and is ultra vires.

12       Defendant is entitled to the benefit of the published regulation in force at the time of the

13  alleged violations.  The IRS may not retroactively apply a penalty structure that was not lawfully

14  enacted through rulemaking or notice-and-comment procedures.

15       Accordingly, any penalty assessed in excess of $100,000.00 must be vacated.  This

16  regulatory limitation operates independently of Defendant's other statutory, constitutional, and

17  equitable defenses, and warrants reduction of any enforceable penalty to the level authorized by 31

18  C.F.R. § 1010.820.

19  **<u>NINTH AFFIRMATIVE DEFENSE</u>**

20  **Arbitrary and Capricious Agency Action**

21       The IRS's determination that Defendant's conduct was willful, and its imposition of the

22  maximum penalty permitted by statute, were arbitrary, capricious, and an abuse of discretion

23  within the meaning of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A).

24       Under the APA, agency action must be the product of reasoned decision-making, must

25  consider all relevant facts, and must reflect a rational connection between the facts found and the

26  choice made.  Here, the IRS failed to meet that standard.

27       The IRS initially proposed willful penalties for five separate years (2005–2009), each at

28  50% of the highest account balance — a total that would have exceeded 200% of the account's

value.  This approach disregarded mitigation guidelines and threatened a confiscatory result.

Only after Defendant challenged the proposal did the IRS revise its approach to impose a single penalty based on the 2007 high balance, still totaling more than $630,000. The IRS provided no explanation as to why 2007 was chosen, why other years were excluded, or why no penalty reduction was granted.

The IRS ignored clear mitigating factors, including:

Defendant's voluntary disclosure years before audit;

Her full cooperation with the examination

Her reliance on licensed CPAs;

Her age and personal hardship during the years in question; and

Her complete absence of prior compliance violations.

The Internal Revenue Manual (IRM § 4.26.16.6.4.1) directs that agents consider such factors and expressly discourages stacking penalties across multiple years in excess of 100% of the highest account balance.  Defendant's case satisfied the IRM's criteria for mitigation — yet the IRS disregarded them.

In addition, the IRM directs that penalties should be asserted ONLY to promote compliance with the FBAR reporting and recordkeeping requirements.  In exercising their discretion, examiners should consider whether the issuance of a warning letter and the securing of delinquent FBARs, rather than the assertion of a penalty, will achieve the desired result of improving compliance in the future.

In United States v. Jones, 2020 WL 4390390 (C.D. Cal. May 11, 2020), the court found that an FBAR penalty determination was arbitrary and capricious because the IRS used the highest account balance from one year to apply penalties to others, without analysis.  The IRS's methodology in this case is equally flawed.

The penalty imposed on Defendant was not the result of individualized analysis, but rather of a reflexive effort to maximize enforcement.  The agency ignored the testimonial and documentary evidence submitted during the examination and failed to issue a reasoned explanation for rejecting the Defendant's position.

Verified Answer to Complaint and Affirmative Defenses

1    For these reasons, the assessment must be vacated under the APA.  In the alternative, the

2    Court should remand the matter to the agency for proper reconsideration, applying consistent

3    procedures and duly weighing Defendant's mitigating circumstances.

4    <u>**TENTH AFFIRMATIVE DEFENSE**</u>

5    **Mitigation Threshold Conditions**

6    ***IRM 4.26.16.6.6.1 (11-06-2015)***

7    For FBAR cases, if the IRS determines that the violation occurred after October 22, 2004,

8    and four threshold conditions were met, then that person may be subject to less than the maximum

9    FBAR penalty depending on the amounts in the accounts.  The IRS allows for mitigation of the

10    penalty if the taxpayer meets four elements, which these Defendant and Friedemann do:

11    1.    For violations occurring after October 22, 2004, the four threshold conditions are:

12    A.    The person has no history of criminal tax or BSA convictions for the

13    preceding 10 years, as well as no history of past FBAR penalty assessments.

14    B.    No money passing through any of the foreign accounts associated

15    with the person was from an illegal source or used to further a criminal

16    purpose.

17    C.    The person cooperated during the examination (i.e., IRS did not have

18    to resort to a summons to obtain non-privileged information; the taxpayer

19    responded to reasonable requests for documents, meetings, and interviews;

20    and the taxpayer back-filed correct reports).

21    D.    IRS did not sustain a civil fraud penalty against the person for an

22    underpayment for the year in question due to the failure to report income

23    related to any amount in a foreign account.

24    The Defendant meets the Mitigation Threshold Conditions as mandated by the IRM, and minimum

25    penalties should be assessed in this situation.

26    <u>**ELEVENTH AFFIRMATIVE DEFENSE**</u>

27    **Additional Defenses**

28    Defendant presently has insufficient knowledge or information upon which to form a belief

as to whether additional, yet unasserted, affirmative defenses.  Therefore, Defendant expressly reserves the right to amend this Answer to assert any additional defenses, whether legal, equitable, or constitutional, that may become available or appropriate as discovery progresses or further legal analysis warrants.  Nothing herein shall be deemed a waiver of any defense not expressly pled at this stage.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendant Hisako Matsubara respectfully requests that the Court enter judgment in her favor and against Plaintiff United States of America as follows:

1.    That the Complaint be dismissed with prejudice;

2.    That the Court find and declare that Defendant did not willfully fail to file FBARs for the years 2005 through 2009;

3.    That the Court find that any failure to file FBARs was due to reasonable cause under 31 U.S.C. § 5321(a)(5)(B)(ii), and that no penalties are due;

4.    In the alternative, that the Court reduce any FBAR penalties assessed to the statutory maximum for non-willful violations, or to such lesser amount as the Court deems appropriate under the facts and applicable law;

5.    That the Court declare the FBAR penalties assessed against Defendant void or unenforceable to the extent they exceed the regulatory maximum under 31 C.F.R. § 1010.820 or violate due process;

6.    That the Court determine that the penalties imposed are unconstitutionally excessive under the Eighth Amendment and reduce or abate them accordingly;

7.    That the Court find that some or all of the penalties are barred by the applicable statute of limitations under 31 U.S.C. § 5321(b) and/or 28 U.S.C. § 2462;

8.    That the Court declare the penalty assessment to be arbitrary and capricious in violation of the Administrative Procedure Act and either vacate the assessment or remand the matter to the IRS for reconsideration and recalculation in accordance with the Court's findings;

9.    That the Court take into account Defendant's voluntary disclosure and full cooperation with the IRS in determining that no judgment should be entered for penalties, interest, or costs;

Verified Answer to Complaint and Affirmative Defenses

10.    That Defendant be awarded her costs of suit, and attorneys' fees as permitted by law, including under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

11.    That the Court grant such other and further relief as it deems just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Defendant HISAKO MATSUBARA hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 22ⁿᵈ day of May 2025.

/s/ Daniel L. Sheehan
DANIEL L. SHEEHAN
Silicon Valley Wealth Law
3705 Haven Avenue, Suite 108
Menlo Park, CA 94025
Telephone: (877) 878-1700
Facsimile: (650) 649-1802
Email: dan@svwl.org

### VERIFICATION

I, HISAKO MATSUBARA, am the Defendant in this action. I have read the foregoing Answer and know its contents. I declare under penalty of perjury under the laws of the State of California that the foregoing facts stated in the Answer are true of my own knowledge, except as to those matters stated on information and belief, and as to those matters, I believe them to be true and correct.

Dated: May 21, 2025

HISAKO MATSUBARA, Defendant

### VERIFICATION

I, FRIEDEMANN FREUND, am not a Defendant in this action. I have read the foregoing Answer and know its contents. I declare under penalty of perjury under the laws of the State of California that the foregoing facts stated in the Answer are true of my own knowledge, except as to those matters stated on information and belief, and as to those matters, I believe them to be true and correct.

Dated: May 21, 2025

FRIEDEMANN FREUND

Verified Answer to Complaint and Affirmative Defenses